UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ROBERT P. BURKE, YONGCHUL "CHARLIE" KIM and MEGHAN MESSENGER,

Defendants.

* * * * * * * * * * * * * * * *

Criminal Action No. 24-00265

Washington, D.C.
September 23, 2024
10:14 a.m.

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE TREVOR N. McFADDEN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: JOSHUA S. ROTHSTEIN, ESQ.
UNITED STATES ATTORNEY'S OFFICE
FOR THE DISTRICT OF COLUMBIA
601 D Street, Northwest
Washington, D.C. 20530

KATHRYN E. FIFIELD, ESQ.
U.S. DEPARTMENT OF JUSTICE
1301 New York Avenue, Northwest
Suite 1000
Washington, D.C. 20530

FOR THE DEFENDANT BURKE: TIMOTHY PARLATORE, ESQ.
ANTOINETTE QUINN-O'NEILL, ESQ.
PARLATORE LAW GROUP, LLP
260 Madison Avenue
17th Floor
New York, New York 10016

APPEARANCES, CONT'D:

FOR THE DEFENDANT KIM: WILLIAM A. BURCK, ESQ.
AVI PERRY, ESQ.
QUINN, EMANUEL, URQUHART & SULLIVAN
1300 I Street, Northwest
Suite 900
Washington, D.C. 20005

FOR THE DEFENDANT MESSENGER: ROCCO F. D'AGOSTINO, ESQ.
LAW OFFICES OF ROCCO F. D'AGOSTINO
445 Hamilton Avenue
Suite 605
White Plains, New York 10601

REPORTED BY: LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

THE COURTROOM DEPUTY: Your Honor, this is Criminal Case 24-265, the United States of America versus Robert Burke, Yongchul "Charlie" Kim and Meghan Messenger.

Counsel, please come forward to identify yourselves for the record, starting with the Government.

MS. FIFIELD: Good morning, your Honor. Kathryn Fifield on behalf of the United States. And with me at counsel table is AUSA Joshua Rothstein.

THE COURT: Good morning, folks.

MR. PARLATORE: Good morning, your Honor. Timothy Parlatore on behalf of Admiral Burke, joined by Toni O'Neill.

THE COURT: Good morning.

Good morning, Ms. O'Neill.

MR. BURCK: Good morning, your Honor. William Burck and Avi Perry for Mr. Kim.

THE COURT: Good morning, folks.

MR. D'AGOSTINO: Good morning, your Honor. Rocco D'Agostino, attorney for Meghan Messenger.

THE COURT: Good morning, Mr. D'Agostino.

And good morning, Ms. Messenger.

All right. We're here primarily on the motion to sever. I'll tell you where I see things and I'll give you all a brief opportunity to address this.

I feel like, A, the late motion on *Bruton* is

something that would not cause severance. I mean, if the Government wants to go forward with a joint trial, they suffer the risk that some or all of the statements would be suppressed. But I would not sever on that basis. And so I don't think that's really something that we need to focus on now.

The arguments about overly prejudicial evidence, a kind of misbalance of evidence, also I frankly was not very convinced by. So I'm not very interested in hearing arguments on that.

I think the closer question is the suggestion of irreconcilable differences between defenses. Especially I think Mr. Parlatore probably has the best argument among the defense that his client, who's saying, as I understand it, that there was no quid pro quo during his course of employment, whether that -- and while his Co-Defendants are suggesting that there was a quid pro quo, but they believed that it was acceptable, given various indicia they received from Mr. Burke and his colleagues, I think that is a much closer question as to whether this puts Admiral Burke in an untenable situation.

So I think we should focus in on that.

And, Mr. Parlatore, I'm happy to hear first from you.

MR. PARLATORE: Well, when your Honor begins by

saying you think I had the best argument, I'm afraid to bury it by saying anything more.

I do think that if you just simply look at the briefings in this case and, you know, the differing arguments between what we've raised versus what the Co-Defendants have raised, I think that that illustrates exactly what would happen during trial; you know, that we have a situation where the Co-Defendant is, you know, characterizing certain things as confessions and that of course we would, you know, not do that.

And really you're going to have, you know, very much a situation where, you know, the two Co-Defendants are kind of pointing the fingers at each other and creating an extremely confusing issue for the jury.

This is a kind of situation where I guess ordinarily it would be the Government's dream to have two Defendants that are willing to point the finger at each other. The problem is, neither Defendant, their version of events matches what the Government wants somebody to come in and cooperate and testify to.

So --

THE COURT: Well, am I correct you do not expect your client is going to be pointing the finger at anyone? Am I understanding that correctly?

MR. PARLATORE: Not in the context of saying that

anybody has committed a crime.

You know, there are certainly issues related to -- to the extent that emails from Mr. Kim and Ms. Messenger are introduced by the Government, to where my client has a significant interest in undermining their credibility and, you know, attacking the credibility of the declarant, you know, should they not testify in their defense.

But as far as, like, actually pointing the finger and saying, you know, that the two of them committed a crime, you know, my client is very adamant nobody committed a crime here. There was no quid pro quo. And, you know, that is really irreconcilably oppositional to the position of the Co-Defendants.

THE COURT: So I'm not sure that a theory of the case necessarily is going to get you where you need to go. What specific evidence do you expect that could be elicited, and I suppose primarily by your co-counsel, that would put your client in an untenable situation?

MR. PARLATORE: The big thing that -- and I have no idea what evidence they intend to introduce. But just reading the papers, it does appear that there's a possibility that the Co-Defendants may testify. And certainly in that situation, where the Co-Defendants choose to testify, if they're going to be pointing the finger at Burke and saying, "Yes, we had this discussion; yes, there

was an agreement, you know, no contract, no job; but he said it was okay because we weren't a defense contractor," you know, that is exactly I think -- that is exactly the type of evidence that would be the most oppositional.

That same -- and obviously, while it's most obvious in the context of one of the Co-Defendants taking the stand, it is the same type of thing that you would expect to be a theme of their cross-examination of the Government's witnesses and any other witnesses that they may try to call, the way they're going to try to characterize, you know, the Government's exhibits as, you know, yes, showing that there was some type of a quid pro quo, but it being okay because Admiral Burke said it was okay.

THE COURT: Mr. Parlatore, going back to the idea of one of the Co-Defendants testifying, how is that different than, like, a cooperator, for instance? Frankly, it's not terribly unusual to have alleged co-conspirators testifying. And, you know, you're an accomplished defense attorney. I think you could take that in stride. Why is this different?

MR. PARLATORE: Well, because that is when I am cross-examining a Government witness.

But here, it's going to be a situation where the Co-Defendants are cross-examining each other. And I think that that is exactly the type of thing that for the jury is

going to be, you know, all the more confusing and could lead them to the improper conclusion where if the Co-Defendants are offering these diametrically opposed defenses, which is exactly what the standard is for severance, to where I'm cross-examining the guy that's sitting two seats down from me at the table this entire trial, you know, and saying that he's essentially committing perjury before this jury, I do think that that is -- it is -- it has similarities, yes, to cross-examining a cooperating witness.

But here, it's going to be a situation where I'm cross-examining a Co-Defendant.

And it's not -- and then yet on top of that, you're going to end up having kind of three-way closing arguments, where -- you know, usually, it's a Government cooperator and then it's just me and the Government that are arguing back and forth over whether you should believe this person.

But here, you're going to have kind of three-way oppositional -- it's very much a circular firing squad, if you will.

THE COURT: All right. I take it your client has not made a decision whether or not he's going to testify. Is that fair to say?

MR. PARLATORE: That is fair to say. It's something that I normally don't decide until after hearing

the Government's case in chief.

THE COURT: Right.

MR. PARLATORE: I'm not inclined to at this time, but I always keep the option open.

THE COURT: I think you all did the right thing by filing a brief now. But the posture -- obviously, the case law is very much after the trial.

MR. PARLATORE: It is.

THE COURT: And there's good reason for that. But it makes -- we're all kind of speculating about how things might go. And this is a pretty drastic remedy for something that might not happen at all.

MR. PARLATORE: I see that, Judge.

And, you know, it is unique in that this is all being brought up ahead of time. But I think -- and I suspect that when Mr. Burck gets up after me, he's going to offer something from a different angle but of a very similar theme, that, you know, this is not necessarily hypothetical, you know.

If we all go to trial, unless there's a change in strategy from the Co-Defendants' side, this is definitely going to happen. It's going to be something that -- I guess we've preserved it very well. But I'd rather deal with it, you know, pretrial when we have the opportunity to remedy it and get it right the first time than go through the trial at

which point then the standard -- you know, you're correct: It's normally looked at after the fact. And there, the record is going to be much clearer and much more, you know, obvious than in a lot of the other cases that the Circuit has examined.

But here, we do have the opportunity to remedy it prophylactically.

THE COURT: So I'm hearing your concern about your Co-Defendants testifying. I'm hearing arguments that are pointing the finger at your client.

Anything else that -- any other evidence that you're expecting that would come out in a joint trial that would not come out against your client were he being tried alone?

MR. PARLATORE: Well, you know, as your Honor correctly noted about the *Bruton* issue in the beginning, you know, that whole interview of Admiral Burke is something that is -- it's already been presented as an exhibit by the Co-Defendants. So again, I don't know what type of evidence they may want to put in, you know, during the trial that the Government may decline to do.

And so there are -- to a certain extent, I'd like to defer this until after Mr. Burck gets up and talks about what he wants to introduce. But I do believe it's going to be more than just that. I think it's going to be more

extensive. I think it's going to include, you know, not only the differing cross-examinations of the Government's witnesses, of the Government's exhibits, but also things that may be introduced by the Co-Defendants.

THE COURT: I can't see how your client's interview could possibly be a reason for severing -- for you for severance.

MR. PARLATORE: I understand that, Judge.

And quite frankly, if it's something that the Government did want to introduce in their case in chief, you know, there are suppression issues with that as well. But maybe we don't have to go there. We'll see.

THE COURT: Thank you.

Mr. Burck?

MR. BURCK: Thank you, your Honor.

So I'll just start here, your Honor, on the issue of the mutually antagonistic defenses.

Really the only viable path that we see for our client to defend himself adequately in this case is to inculpate Mr. Burke. Not this Mr. Burck, but the Defendant Mr. Burke.

And the reason for that -- and let me just back up a little bit, your Honor. We filed our motion to sever back in July. And it was actually before we even had gotten most of the discovery.

And the reason we did it that early was because we understood from some statements that were made in the press, et cetera, that the defense that Mr. Burke was going to present was essentially that there were no real discussions about a job and there was no quid pro quo.

Now, our client, as is very clear from the papers, understood the situation very differently, which was that, yes, of course there were discussions. And in fact, there's plentiful evidence that Mr. Kim knew there were discussions and had those discussions, because he talks to just about anybody who will listen about those discussions in real time when this alleged conspiracy is going on.

So from his perspective: Yeah, we had discussions. But I didn't realize that there was anything wrong with that, because Mr. Burke or Admiral Burke had told me that this was fine because I'm not a defense contractor.

And I told everybody. I thought it was a great thing to tell everybody, all of my investors, all my employees, really anyone who would listen.

So from his perspective, the issue here is: What was in his mind? What was his intent? Did he have a corrupt intent in having the discussion he did with Admiral Burke?

The answer to that from our perspective is he did not. We think the evidence will show that.

But in order to do that, we're going to have to put in a lot of evidence if the Government doesn't do it itself to show a critical issue, which is that Admiral Burke is a -- for lack of a better term, he doesn't tell the truth. He lies. He misleads people. He tells people things that will advance his own interests, but has no semblance or resemblance to the truth.

We have plentiful evidence of that not just from what Mr. Kim knows about his own interactions with Admiral Burke, but also from the evidence the Government has presented in this case.

And a lot of that evidence is not, we think, admissible against Mr. Kim or Ms. Messenger as to the four counts of the indictment that are only about Mr. Burke. But all of that evidence goes to his untruthfulness. It goes to the fact that he was misleading the Navy and he was telling the Navy he was not engaged in job discussions while in fact he was.

And in fact, Mr. Kim and Ms. Messenger both know that he was because they were engaged in those discussions with him.

In terms of the question of whether or not Mr. Kim would testify, your Honor, we obviously can't commit to anything right now. But we can tell you that he is inclined to testify. He is very inclined to testify. He has no

criminal history. He has -- we're not aware of any 404(b) issues for him. We don't -- he doesn't have any personal issues that we are aware of.

So he is inclined to testify. We think he will testify. Obviously, we have to check to see what the Government's case looks like to make that determination. But that is his inclination.

THE COURT: Mr. Burck, let me go back to the purported lies that you'd be expecting to introduce against Admiral Burke. What do you think you'd be putting in that the Government would not be likely to put in anyway?

MR. BURCK: Your Honor, I think that the -- it's a little hard to tell. But there are a number of emails that we have included as exhibits in our opening brief that go through statements that Mr. Kim made or Ms. Messenger made to their investors and others.

Some of that may have been -- or was quoted. Some aspects of it were quoted by the Government in the indictment. But we're not sure that the Government's going to offer all of that to show what Mr. Kim was thinking, what he was saying to people. They might try to cherry-pick it and use the idea that everything other than his own statements that were inculpating of him were hearsay, not co-conspirator statements, so we can't get those in unless he testifies.

So our intention is to introduce all of this evidence -- again, we don't know if the Government is going to object or if they're going to offer it themselves -- that would show exactly what he was saying about his contemporaneous communications with Mr. Burke, Admiral Burke, about the job discussions.

THE COURT: Sorry. You're expecting to bring your own client's communications in?

MR. BURCK: Yes, your Honor.

THE COURT: Okay.

MR. BURCK: We think they would come in for -- they're a hearsay exception; for example, state of mind. So, your Honor, we don't think -- we think we can overcome any evidentiary challenge the Government had to it.

THE COURT: But how does that show that Admiral Burke was lying?

MR. BURCK: Your Honor, because we believe the Government is going to show through witnesses, including -- I'm not sure exactly what to call her, but one of the star witnesses --

THE COURT: Person 3?

MR. BURCK: Person 3. Person 3.

-- that through her and others, that while he was telling Mr. Kim and Ms. Messenger that we can have all these discussions and we could have -- we can get to a deal even

while I'm still an admiral and I have this contract that's pending before me, that he was acknowledging to other people through -- either directly about this contract or just generally about his position that of course he can't have job discussions with contractors who are before him, who he has to make decisions about whether or not to hire them.

So while the Government's putting up its case and its witnesses and its documents, showing -- of course, your Honor, you've probably seen some of this in, I think, some of the Government's filings, but also in ours -- that there are a legion of WhatsApp messages, text messages, between Person 3, if I'm right about that being Person 3, and Admiral Burke about what he's doing and what he's saying to my client and to Ms. Messenger.

And in contrast, what we're going to be showing is what he was actually saying to them was two diametrically opposed things, that on the one hand he's telling them, my client, that: No problem; we can have these discussions; no issue. In fact, we're having these discussions.

Meanwhile, he's telling other people other things. And he also is -- he's telling people that he understands the rules of the Navy, which they can't have these discussions.

And with respect to the charges of the indictment that are only about Admiral Burke, there's going to be a

wealth of evidence that we've seen to show that he was not telling the truth.

There are WhatsApp messengers, your Honor, between Person 3 and Admiral Burke, where he says things like, We basically have a deal on the job with Mr. Kim. We basically have a deal on the job.

At the same time he's telling the Navy, Never had any discussions until May of 2022, which is right before he retired from the Navy. And he has ongoing discussions with other people that suggest very clearly that he was misleading them about discussions he was having with Mr. Kim and Ms. Messenger. He was misleading them about what kind of discussions he could have.

So there will be -- our case will largely be about actually showing that Mr. Burke is not truthful, that he lies habitually, that he lied to the Navy, that he lied to Mr. Kim, that he lied to Ms. Messenger. And there were some people who knew what he was doing to some extent, like Person 3, because he was having candid conversations with them, given their personal relationship. But others didn't. The Navy didn't know and Mr. Kim and Ms. Messenger didn't know.

THE COURT: And so I think I can see how this would -- how Mr. Parlatore would want to keep this out. I take it that's why you're telling me this, not so much that

you think this is a reason for your severance, but for Mr. Parlatore's motion?

MR. BURCK: Yes, your Honor. I think that our -- we started this whole severance train.

THE COURT: Yes.

MR. BURCK: And I think the reason for that is because from our perspective we understand the tension there. What we're doing is we're pointing the finger at Admiral Burke. We don't know exactly what he's going to say about us that becomes relevant to the trial.

But for us, being in the same trial with somebody that we are saying, "He's a liar, he's a liar, he's a liar," that will obviously create the incentive for Mr. Parlatore to come back and try to attack our credibility, the credibility of our evidence, our witnesses, especially if Mr. Kim testifies.

So from our perspective, it still is not a great outcome for our clients to be in a trial where they have to say that he did everything and it's all his fault and he lied to us and he lied to everybody, that, yes, it might lead to an acquittal, but it could also just be a pox on all your houses. That's why we raised the issue, because we do think it's a significant issue.

But to your point, I think that Admiral Burke, at least the way that we hear it today, that he's the one who's

going to suffer severe prejudice, because our case will be against Admiral Burke. It'll probably be most of our case, most of our defense, because at the end of the day, as you've seen in our papers, no one on this side is saying these discussions didn't happen. They acknowledge it readily. They say: Yes. Of course it happened. And in fact, it was in contemporaneous emails as well.

The issue for us is: What did Mr. Burke tell our client about why they could have those discussions? And that's the issue that at the end of the day is extremely prejudicial to our Co-Defendant. And we think that there's -- that the mountain of evidence the Government has -- and it seems like a mountain to us -- that he was not being truthful is stark.

Then we're adding on top of that and saying: Yeah. Exactly. He lied, and he lied to us. And that's why we're not that crazy or stupid to tell everybody we're engaged in a criminal conspiracy while it's happening. Hundreds of people, your Honor, were told in these emails in detail about exactly what conversations they were having.

And the reason why they were not crazy or stupid is because they thought that they could do it because they were told they could do it.

So we will spend all our time explaining why Mr. Burke or Admiral Burke is a liar, effectively.

THE COURT: I imagine Ms. Fifield is going to be telling me that this evidence isn't terribly helpful to you, that bribery is bribery, and somebody telling you that you're allowed to bribe me is not a defense. Why is she wrong on that?

MR. BURCK: Well, your Honor, I think that she's wrong because there is still the corrupt intent that has to be part of a bribery scheme. And here, it is very -- it is not -- there's no strict liability or very little strict liability in criminal law, and there's certainly no strict liability when it comes to bribery.

And here, a jury could very reasonably look at this evidence, especially some of those contemporaneous emails, and ask themselves the question: What criminal mastermind or person with bad intent would literally tell everybody, "Here's what I'm doing," people that have nothing to do with the conspiracy, who are not charged as co-conspirators, who have -- who don't raise as far as we can tell in the discovery any concerns about this, and repeatedly tells them this?

And our defense is that what was in Charlie Kim's mind was: This is okay. I can do this, because I was told I could do this; and I believed him because he was a four-star admiral who ran this entire unit of the Navy, ran the whole thing.

And he also -- Mr. Kim would say that there were other members of the military who were not charged as co-conspirators who were present for these conversations, not only Ms. Beyler in an early conversation, but also Person 3, who was not charged in this case.

And Person 3, your Honor, as we explain in our brief, Admiral Burke lied to them about who she was. He -- and this is borne out also in the contemporaneous WhatsApp messages between Person 3 and Admiral Burke, where they come up with a story about who she is. And they -- and what they tell Mr. Kim and Ms. Messenger is that she is a senior naval official. Now, she is a naval official. But they tell her that's why -- they tell my two clients, Why she's there is because I want her to hear this.

And so in their minds, not only are they telling all these investors and employees; they're talking to other senior Navy people, including Ms. Beyler and then also Person 3, and they're openly discussing the job prospect with somebody who they've been misled again about who she is, that they're not told that she's actually in a personal relationship with Admiral Burke. They're told that she's a naval official that wants to hear about this and to some extent vet it.

So from their perspective, they're being constantly mislead. All of that is critical both to our

defense, but also it's extremely prejudicial to Admiral Burke.

And again, for a lot of this we don't even need Mr. Kim to testify. This is literally in the statements which I'm sure the Government is not going to forego, the WhatsApp messages between Person 3 and Admiral Burke. I mean, there's a legion of them. There's all kinds of -- it is probably the heart of their case. As well as presumably Person 3 will testify. So all of that is going to be central to how we present this case.

And one last point on Person 3, your Honor: Person 3 -- and again, this is in our briefing. Person 3 actually said to the Government in a 302 that she was surprised by the way that Mr. Kim and Ms. Messenger talked openly about a job in front of her with Mr. Burke at this lunch they had in July of 2021.

And she had the impression that maybe they didn't know that they couldn't do this, "they" being Mr. Kim and Ms. Messenger. She says that in the 302. She says it a couple times.

And so that type of evidence, you know, which to some extent she obviously -- we're going to cross-examine her if she testifies. I'm sure she will testify. But at the same time, a lot of that is helpful to us. Again, it goes right back to her -- to Admiral Burke.

Now, there's no way, unless the Government has a different conspiracy theory than they've already alleged, but if our clients were acquitted on the conspiracy charge, then Mr. Burke would have to be acquitted too, because he needs to -- you need two people at least, of course, to be in a conspiracy.

But the substantive bribery, he could still be convicted on that, as our clients could also be, even if there's no conspiracy. But if we win the conspiracy charge, we believe that we also win the bribery charge.

But for him, he might still be convicted of bribery even if he's acquitted on the conspiracy because of all the evidence that we're going to show and that the Government is going to show that he was perpetual -- he knew that he couldn't do this. He knew that he couldn't have these conversations. He understood that very well.

And then he lies to the Navy very explicitly in May of 2021 when he's -- right before he's going to retire and he tells them he's never had any discussions and actually tries to get Mr. Kim and Ms. Messenger to agree to that. They don't.

But, your Honor, I'm sorry to belabor the point; but just for the evidence -- to show you how the evidence would progress in the trial, after that period, after the May 2022 document that Mr. -- that Admiral Burke sends to

the Navy saying that "I haven't had any job discussions," and he sends that to Mr. Kim and Ms. Messenger, thereafter, just to show their level of confusion about what was going on, they were told -- and again, this is in documents -- they were told by Admiral Burke that there was a problem with the Navy, that they were looking at some of his communications and his dealings with Next Jump, but it was an internal issue. It was not that big a deal.

And so for them, they persisted in highlighting the fact that Admiral Burke was coming on board and telling everybody again that he's coming on board, even though they knew that he was now under investigation.

And they offered him a job and they brought him in with a job anyway, all because, from our perspective, they didn't think they were involved because they thought that, Well, whatever issue he has between him and the Navy, we have been told that this was fine, which is why we've been so open about it.

So the case is going to be -- from beginning to end is going to be about our clients, Mr. Kim and Ms. Messenger, saying -- pointing the finger at Admiral Burke and saying: We are not crazy and we're not stupid. So the reason why we were doing all this stuff is because we believed it was okay because he told us it was okay. And we're going to try to corroborate that with all these

documents that'll show and all these witnesses that will show that he was telling everybody different things.

THE COURT: All right.

MR. BURCK: That's the way we'll present the case, your Honor.

THE COURT: Thank you, Mr. Burck.

MR. BURCK: Thank you, your Honor.

THE COURT: Ms. Fifield.

MS. FIFIELD: Your Honor, I think you put -- you hit the nail on the head when you -- starting with Mr. Parlatore's arguments as to Defendant Burke. You asked Mr. Parlatore whether his client was expecting to point the finger at any other Defendant.

And the answer is no. And that defeats the mutually antagonistic defenses entirely.

All of these concerns that the attorneys for the Defendants have outlined are strategic and tactical concerns, which do not entitle these Defendants to severance. There must be a specific trial right that is compromised.

You also asked, you know, What specific evidence would your client be seeking to enter that would put your -- would your client be seeking to enter that would put your client in an untenable position?

And Mr. Parlatore responded that he expects the

Defendants to testify. Mr. Burck also said that he expects Defendant Burke to testify.

But Defendants are not entitled to severance based on a desire to keep out a Co-Defendant's testimony. And that's *United States versus Gilliam*, G-I-L-L-I-A-M, 167 F.3d 628, 635, D.C. Circuit, 1999.

Mr. Burck would not -- or Mr. Parlatore through Defendant Burke would not be seeking to cross-examine any of the Defendants furthermore for the purpose of proving that the Co-Defendant committed a crime. He would be cross-examining for the purpose of proving that the Co-Defendants did not commit the crimes that's been charged in the indictment.

As to Kim and Messenger, it's important to note that every complaint that they have about evidence coming in as to Burke's concealment and how they did this both in the Far More Damaging Evidence section of their brief as well as the Conflicting Defenses section, this was part of the conspiracy.

If Burke had not concealed the Defendants' arrangement from the Navy, the conspiracy never would have succeeded. If Burke had disclosed that he had had these employment conversations with Kim and Messenger as well as -- and, you know, not even beginning to touch directing the contract to them -- Burke would not have been -- you

know, that would have foiled Next Jump's chances to obtain further contracts from the Navy, which was an integral part of their goal in engaging with Defendant Burke, and Burke would not have been able to join them as an employee after his retirement.

THE COURT: But what I'm hearing from the Defendants, particularly Mr. Burck, is that he's going to be saying that not only was Admiral Burke lying to the Navy, but he was also lying to his Co-Defendants. And are you going to be entering that evidence? And why isn't that evidence problematic for this kind of second prosecutor idea?

MS. FIFIELD: What I understood Mr. Burck to be saying was that they intend to paint Burke as a liar in one instance based on their argument that he lied on other instances.

And just off the top of my head, listening to his argument just now, I believe that would be improper purpose. I don't believe they would be able to use instances of him having, according to them, lied on other occasions to prove that he lied on a specific occasion to Kim and to Messenger.

As to the emails, you know, I heard Mr. Burck say, We're not sure what the Government is going to enter.

And to the Court's point when Mr. Parlatore was up here, this is premature. The conflicts that the Defendants

complain about, A, even if they came to pass would not entitle them to severance. They're not entitled to severance for a tactical advantage. They're not entitled to severance to keep out a Co-Defendant's testimony. They are not entitled to severance because they are hostile to each other.

The degree of conflict that would be required -- and I think the prototypical example would be two guys in a room. No additional evidence. One says he had -- Guy A had the gun and he shot the victim. The other one says Guy B had the gun and he shot the victim.

And the jury would be required to believe one at the expense of the other without any independent evidence pushing the needle either way.

THE COURT: So, Ms. Fifield, is your position that they both must be pointing the finger at the other for it to be problematic?

MS. FIFIELD: Without independent evidence. And that's a key point. And this is clear in the case law, too, in *United States versus Edelin*, E-D-E-L-I-N, 118 F.Supp.2d 36. And that's the D.C. District Court, 2000, relying on *United States versus Leonard*, 494 F.2d 955, D.C. Circuit, 1974.

When there is independent evidence that all members of the conspiracy are guilty, which we have in

spades here, where there is independent evidence of each Defendant's guilt, this mutually antagonistic defenses doctrine is inapplicable. Those cases say that explicitly.

We have evidence that, you know, all of the confessions, essentially, that Kim and Messenger put in writing after their April meeting with Defendant Burke -- and just as an aside, you know, Mr. Burck made much of other people being present in these conversations, and he relied particularly on Juliette Beyler. But there were two meetings, importantly, in April of 2021.

In the first meeting, in which Ms. Beyler was in attendance, they did not -- the evidence reflects that the conversation was a sales pitch, whereas in a second April meeting, which the evidence shows only included Defendant Burke, Kim and Messenger, Kim put in an email that Messenger felt slimy, which goes to their corrupt intent, because he wants a job, but we're asking for a deal first. Kim put that in writing, quoting Meghan Messenger.

Kim further elaborated in email after email after email the pieces of the scheme and he called it -- after the their July meeting, he called it a three-phased plan. He wrote emails to -- both internal emails to Company A personnel, which, contrary to what Mr. Burck just said, the Government does not have evidence that these emails, as he put it, went to hundreds of people.

But Kim wrote in these emails that in Phase 1, Burke would direct Company A a contract.

In Phase 2, Burke would promote Company A to the wider Navy and to former military in an effort to help secure future contracts for Company A which would benefit him personally, because in Phase 3 he's going to work for them after his retirement.

He put that explicitly in emails to Company A personnel and to investors.

And in the email to investors after the July meeting, he said, "Please keep this confidential," as to Burke joining Company A after his retirement.

The evidence will also show, as the Court probably has gotten a feel for at this point, that Charlie Kim is a chronic oversharer. He puts everything in emails, especially to Company A personnel. He includes in these emails the justification for doing this. He calls it "informating." He needs to informate everyone in Company A as to his and Messenger's internal thought processes. And they do this repeatedly.

But they were doing this with people whom they trusted, internal Company A personnel, which I believe has around two dozen employees.

And these listservs did not even include every employee on -- that worked for Company A.

THE COURT: Ms. Fifield, I want to just think practically with you for a minute. I mean, how long would you expect these -- if we did two separate cases, two cases instead of one, how long would you expect the Government's case in chief to last?

MS. FIFIELD: For each trial?

THE COURT: Yes.

MS. FIFIELD: I anticipate -- and this goes, you know, in favor of the Government's argument against severance -- I believe the trials would be approximately identical in length and in evidence. I think what we said was ten days.

THE COURT: Ten days.

MS. FIFIELD: Ten business days each.

THE COURT: And I am a little concerned here. As I say, this is a very difficult call to make on the front end. And I think the case law favors you.

I am concerned, though, that we're going to come to halfway through the trial or at the end of trial and realize that there has been such prejudice to Admiral Burke in particular that we've got to declare a mistrial or try him all over again or something like that.

I mean, wouldn't it make more sense to try to avoid this possibility from the outset?

MS. FIFIELD: Your Honor, I don't think that's

what the law calls for. I think the law says -- I don't think; I know -- that the law says that severance is an extreme remedy; and even when prejudice is created or the risk of prejudice is created, the degree of prejudice required is so extreme that it compromises a defendant's specific -- a specific trial right or compromises a defendant's right to a fair trial.

And, you know, accepting your hypothetical that -- or setting aside your hypothetical, rather, the risk of that here is next to zero. The Defendants -- the evidence shows that the Defendants participated equally and independently in the conspiracy. The risk of prejudice here is very, very small.

There was no evidence that Burke was lying to Kim or Messenger. And again, going back to what Mr. Burck has said, I don't believe that they have admissible -- evidence admissible for the purpose of arguing that Defendant Burke was a liar and therefore he lied to Kim and Messenger on specific occasions. I don't believe that they would be able to do that. That's not what the evidence shows.

The evidence shows that each time the Defendants had these conversations, which was repeatedly, that they were -- that there was a meeting of the minds between them. And these conversations happened in April of 2021; they happened in July of 2021; they happened in November of 2021.

Each time, you know, and particularly reflecting on the fact that this arrangement almost fell apart a couple of times, the Defendants had to reengage and re-up and reconfirm their commitment to this conspiracy and making sure that it succeeded.

THE COURT: But using this -- I think it was a lunch conversation -- don't you agree there's evidence that Admiral Burke and Person 3 kind of planned how they would portray her to his Co-Defendants? And why wouldn't they be in a position to argue, We were fooled into thinking this is all aboveboard because there was another high-profile DOD official participating? So, A, it's evidence of their belief that what they're doing is okay and, B, going to feed into this argument from the defense side as well as the Government that Admiral Burke is a liar. How is that not prejudicial to him?

MS. FIFIELD: Well, going back to -- simply because it may be prejudicial is not a basis for severance.

THE COURT: Well, sure it is. Sure it is. That's what Rule 14 says. "If the joinder of offenses or Defendants in an indictment appears to prejudice a Defendant or the Government, the Court may order separate trials of counts."

MS. FIFIELD: What the case law is clear is that prejudice does not mandate severance. Even great prejudice

does not mandate severance.

Setting that aside, that legal standard is clear. That is inconsistent with the evidence. The evidence will show that this lunch was intimate. It was casual. At this lunch, Kim and Messenger both tried to recruit Person 3 to not necessarily come work at Company A, but they understood, the evidence will show, that Person 3 and Burke were a package deal, that convincing Burke to -- at this point, they were trying to convince Burke to come work at Company A. They understood that Person 3 was coming with him. They shared drinks.

The evidence will show that Burke asked Person 3 to find an intimate location for them to have this lunch because Meghan Messenger was already talking about a job. That's in text messages.

THE COURT: I'm sorry. I don't think I understood this before.

Your theory is that both Person 3 and the Defendant Burke were going to be hired by his Co-Defendants?

MS. FIFIELD: Not hired, per se, but they were -- the evidence will show that Kim and Messenger were trying to sell Person 3 on at least Defendant Burke's employment with Company A based on all the benefits that would be available to her: yoga; I think massage salon services that would be available at their headquarters.

There was evidence that they were trying to appeal to her on a personal basis because of her connection with Burke, which to them was obvious.

THE COURT: Okay. Anything else, Ms. Fifield?

MS. FIFIELD: Give me a moment to confer with co-counsel.

(Confers with co-counsel privately.)

Just lastly, you know, there is no evidence that Kim and Messenger believed that it was okay for them to offer Burke a job in exchange for a contract. There is no evidence of that whatsoever.

What the evidence shows is that they had corrupt intent when they, in their own words, were offering Burke a job, but they wanted a deal first.

Messenger put in text messages, "No contract, no job." She said in an email that there was a universe in which everything that they had tried to put together would fall apart because Burke would accuse them of baiting him into a contract for a job.

They never thought that it was okay for them to exchange -- engage in a corrupt exchange with Burke, a contract for a job.

THE COURT: I get that that's your position. But that's not what we'll be hearing from the defense.

And the question for me is whether -- if they're

going forward with this theory that Admiral Burke tricked them into it, whether that places him in an untenable situation. Right?

MS. FIFIELD: It doesn't in -- in the lens of severance, it doesn't place him in an untenable position because he's not entitled to keep out their testimony. The law is clear about that. He is not entitled to prevent them from testifying.

He would have to deal with the exact same evidence, as all of their communications would come in as co-conspirator statements. Neither of these -- neither sets of Defendants have established that they would be subjected to -- with the exception of Co-Defendants' testimony -- that they would be subjected to a different trial if their cases were severed.

And the law is clear that the threat of a Co-Defendant testifying is not sufficient to justify severance, which is an extreme remedy.

And I can't claim to have looked at every severance case in this circuit. I have looked at a lot. And the Defendants have cited none under comparable facts that would support a severance under these facts.

THE COURT: The case law is very good for you in this circuit.

MS. FIFIELD: It is very good for us.

But there's a reason for that. This is not a close question. This is not something that occurred frequently.

This is something that the courts very clearly approach with extreme skepticism. And, you know, it's not an unfair advantage for the Government; it's the law.

THE COURT: All right. Thank you, Ms. Fifield.

Mr. Parlatore, I'll give you a very brief last word.

MR. PARLATORE: Sure.

Your Honor hit the nail right on the head when you read the text of Rule 14. And this is something that your Honor has the discretion to order a severance pretrial when it appears that there is going to be prejudice, which is clearly the case here.

All the case law that's been cited -- and I think both sides have cited it for different propositions -- but ultimately, that's a very different standard because that's after a trial has been conducted in trying to look back and decide whether to disturb a conviction.

And so bringing it at this stage, if you go back to the very text of the rule -- and that's obviously something that, when the Court orders a severance pretrial, you don't end up with appellate case law on it because you've exercised your discretion to sever it. They go to

separate trials. Nobody's going to -- at the end of that conviction, nobody is going to say, Oh, no. You should have denied my motion. So your Honor certainly has the discretion.

I think the facts of this case are markedly different from all of the ones -- you know, Ms. Fifield correctly said we haven't cited a case on similar facts to this, because there aren't really cases that are on similar facts because the prejudice in this case is markedly different and markedly more severe than all of the reported cases that either side has been able to find.

THE COURT: What about her hypothetical of the two men in a room? Frankly, that's kind of my understanding of how this has worked.

MR. PARLATORE: Yes.

THE COURT: And I think that's right that that's not this situation, where your client is saying, "Neither of us shot him." And so we only have one person pointing the finger.

MR. PARLATORE: So -- and in -- you know, I saw that. And to pull that back a little bit, Admiral Burke is not pointing the finger to say either one of those Co-Defendants have committed a crime that's charged in the indictment. Okay? That doesn't mean that he's not going to point the finger at them and say, "They lied to their

investors." Okay? That's not something that's charged, but "Charlie Kim lied to his investors."

Based on the evidence and based on the arguments of Mr. Burck, do we believe that Charlie Kim engaged in attempted bribery? Yes, we do.

If the Government would take, you know, Admiral Burke as a witness and recharge this as an attempted bribery, then I think Charlie Kim is going to jail. That's a very strong case.

In this circumstance, they had conversations. And the evidence shows that while they may have had some preliminary conversations, Admiral Burke pushed back and says, "I am not ready to have a serious conversation about this right now. I can come back to you at a later point." That's what the evidence shows.

And the evidence shows that when he then got the authorization from the Navy, that's when he went back to Charlie Kim and said, "Now I have authorization. Now we can actually begin discussions."

All of the evidence about what happened before then, you have Government witnesses who are saying very different things from what Charlie Kim is saying. You have -- even the numbers. You know, the Individual 3 or Person 3, who obviously has significant credibility issues that we haven't addressed today, she initially said this was

for a salary of 1.2 million a year. That's clearly very different from what Charlie Kim is telling everybody happened at that meeting.

The evidence shows that these two Co-Defendants, they say things. They do overshare. There's a lot that Ms. Fifield said that I agree with. They overshare. And a lot of it is aspirational. They say things that they hope will happen as if they have already happened so that they can manifest that to be.

And so when they are hoping that Admiral Burke will help them out and that Admiral Burke will come over, that is something that they're saying as if it's already happened. And that is, you know, where at trial you're going to end up in a situation where Admiral Burke is going to correctly and honestly be presenting to this jury, "There was no quid pro could."

And Charlie Kim and Ms. Messenger are going to instead say, "Yes, there was a quid pro quo, but we didn't think there was anything was wrong."

Now, that goes squarely into the standard here where you have oppositional defenses that could result in a jury improperly finding both of them guilty, because at the end of this case -- you know, we haven't discussed the jury instructions, but you asked a good question of Mr. Burck: Well, at the end of this, is that even really a defense?

The fact that your Co-Defendant said it's okay, is that something that you're going to tell the jury that they can consider, and that's an affirmative defense to this, is that? You know, is this state in Charlie Kim's mind actually going to be a defense?

Because we may get to the end of this, where we've said there is no quid pro quo. They've said that there is. And the jury says: Well, okay. I believe them, but I also believe the judge and the prosecutors who say that's not a defense.

And so you end up with all Defendants that have been convicted of a quid pro quo that didn't happen.

THE COURT: All right. Thank you, sir.

MR. BURCK: Real quickly, if I may.

THE COURT: Quickly, Mr. Burck.

MR. BURCK: Your Honor, I just wanted to address two issues that I think the Government raised in terms of the length of the trial, the practical issue.

They said that the two trials will be the same length. I'm not sure how that's possible, given that there are, I believe, two or three independent charges against Admiral Burke. They're not against our clients.

We will of course -- if the Government's intention is to offer up all the evidence they're going to present for those three charges against our clients, who are not

charged, we're obviously going to seek to have that excluded.

And there are reams of WhatsApps between Person 3 and Admiral Burke, which we think are incriminating as to Admiral Burke. But they shouldn't be admissible against our clients.

In fact, our clients were on the face of it deceived about who she was. There was no co-conspirator statements between Person 3 and Admiral Burke and our clients. So there's all this other evidence, including when she testifies. She had one meeting with them. One meeting with Mr. Kim and Ms. Messenger. She had a relationship with Admiral Burke.

So the length of the trial, your Honor, I question whether or not that could possibly be true.

THE COURT: Yes.

MR. BURCK: So that's the one thing.

The only other last point, your Honor, is that on Person 3, just the point -- and this is something the Government had mentioned, but I just wanted to highlight again the prejudice -- a strange position to be in -- to my Co-Defendant here: That in sworn testimony, Person 3 has said that she was surprised by Mr. Kim and Ms. Messenger's discussion with her present at this lunch about this job for -- this job for Admiral Burke. And she says that she

thought maybe they just didn't understand what was going on, that they just didn't understand the rules.

In contrast, she says, Of course Admiral Burke knew we weren't supposed to be having this conversation, that he was not supposed to be having his conversation. That's been her sworn testimony. And that's what we believe will be on the stand.

THE COURT: Thank you.

Yes. I think we've got to draw a line on this.

Let me take a moment. I want to consider this.

MR. ROTHSTEIN: Sorry, your Honor. Just one --

THE COURT: No.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURT: All right. Before the Court is ECF 26, Defendants Kim's and Messenger's joint motion to sever; also, ECF 44, Defendant Burke's motion to sever; the Government's opposition; and the Defendants' replies.

Under Rule 14, if joinder of offenses or Defendants in an indictment, an information or a consolidation for trial appears to prejudice a Defendant or the Government, the Court may order separate trials of counts, sever the Defendants' trials or provide any other relief that justice requires.

As an initial matter, the Defendants raise several

theories. First, they claim that severance is warranted based on a mismatch in evidence.

I am not persuaded on that point. I think the case law is decidedly against them there.

They also raise a concern about -- well, Defendants Kim and Messenger raise *Bruton* concerns involving Defendant Burke's post-arrest statements.

I think that would also not be a basis for severance.

I do, however, find that the Defendants, in particular Defendant Burke, has met his burden on the motion to sever on irreconcilable conflicts between the theories and evidence here.

I think that Defendants Kim and Messenger have both been very clear that they are going to be portraying him as a liar and someone who portrayed what he was doing as aboveboard and portrayed what they were doing as permissible because this was not a defense contract.

I understand the Government's argument that that is not really a defense to the charge of bribery. However, I think it would theoretically go to the corrupt intent with which they were acting. And I can certainly see how they would have an incentive to describe him as a liar.

I think as to the potential conflict going the other way, that is certainly less strong. However,

Mr. Parlatore's point at the end that he would be suggesting that Defendants Kim and Messenger may well be guilty of attempted bribery, well, as I understand the case law, that would be a crime here as an inchoate offense, that the Government could be seeking an instruction at trial.

And so to the extent that Mr. Parlatore would be pointing the finger at the Defendants Kim and Messenger and saying that they were trying to bribe his client, but unsuccessfully, we indeed have mutually inconsistent and irreconcilable theories, with both sides on the defense pointing fingers at the other.

This is not a decision I make lightly. It is, I think, a very close call. But given the arguments and the evidence from all sides here, I think that the more prudent course is to sever the trial now rather than waiting to see whether things work out exactly as the defense expects it to be.

All right. Mr. Burck, you'd been seeking an early trial. I'm not even sure if we could-- well, I'm not sure I could potentially do something in November.

Let me ask, Ms. Fifield, is that even realistic at this point from the Government's perspective?

MS. FIFIELD: The date is not firmly set, but I have another trial that I anticipate being set for the first week in December in Jackson, Mississippi, that will of

course involve travel and trial prep. So Government counsel is not available for the rest of this year.

THE COURT: Okay. So I think what I'm going to do is look to keep the currently set trial, but as to Defendants Kim and Messenger.

Mr. Parlatore, are you looking for a continuance?

MR. PARLATORE: Yes, your Honor, we are.

THE COURT: It looks like I'm wide open starting in May. How about Tuesday, May 6th, for a trial as to Defendant Burke?

Ms. Fifield, does that work for the Government?

MS. FIFIELD: One moment, please, your Honor.

(Confers with co-counsel privately.)

MR. ROTHSTEIN: Your Honor, there's an issue I think we would have to address *ex parte* at sidebar.

THE COURT: Oh, sure.

(Whereupon, the following bench conference was held:)

[redacted]



[redacted]

(Whereupon, the following proceedings were had in open court:)

THE COURT: That'll be under seal.

In light of the Government's *ex parte* representations, I'm switching my mind as to where we're -- who's being continued.

Mr. Parlatore, you're on for the currently set date.

Mr. Burck and Mr. D'Agostino, I want to look with you all as to May.

May 6th. Does that work for your client, Mr. Burck?

MR. BURCK: Your Honor, could we be heard briefly on that?

Your Honor, we're not privy to what the Government has said. However, I think Mr. Parlatore would also join me in this, that for both Defendants we would prefer -- we are ready to go on February 19th. And I think Mr. Parlatore would prefer to go later, even if he of course -- the defense will be ready.

But we'd request that the Court reconsider the dates. Again, we don't know what the Government said. But

we would request that we have a speedy trial, including -- if it's going to be in November, we'll ask for November. The Government's big. They have a lot of lawyers. But that would -- that'll be extending their wait for trial for almost a year from indictment.

So we would object to having our trial date put out that far.

THE COURT: I understand.

I'm overruling your objection. Obviously, I've just granted you the severance that you requested.

MR. BURCK: Yes, your Honor.

THE COURT: And I'm going to decide who goes first.

MR. BURCK: Okay, your Honor.

THE COURT: So April -- I'm sorry. May 6th. Does that work for your client, Mr. Burck?

MR. BURCK: Your Honor, if I may have a moment.

THE COURT: Sure.

MR. BURCK: (Confers with client privately.)

Yes, your Honor. That works.

THE COURT: And Mr. D'Agostino?

MR. D'AGOSTINO: Yes, your Honor. May 6th does work.

THE COURT: So we'll set Defendants Kim and Messenger for a jury trial on May 6th at 9:00 a.m. here in

Courtroom 2.

Let's set a pretrial conference. How about Friday, April 18th, at 10:00 a.m.? Does that work for the Government?

MS. FIFIELD: Yes, your Honor.

THE COURT: And, Mr. Burck, does that work for you?

MR. BURCK: Yes, your Honor.

THE COURT: And Mr. D'Agostino?

MR. D'AGOSTINO: Yes, your Honor.

THE COURT: So we're setting that for pretrial conference on April 18th.

I'm not going to set other briefing just yet. We've got a while yet.

Do we have a briefing schedule as to Defendant Burke, Ms. Fifield?

MS. FIFIELD: I believe the Court has not yet set a briefing schedule.

THE COURT: So let's set -- I do want to set a briefing schedule for Defendant Burke. We have a pretrial conference, though. Yes?

MS. FIFIELD: Yes, your Honor.

THE COURT: Great.

MR. PERRY: Your Honor?

THE COURT: Yes.

MR. PERRY: Avi Perry on behalf of Mr. Kim.

If it's possible to set the pretrial one week earlier so it doesn't conflict with Passover, that would be appreciated.

THE COURT: That's fine.

MR. PERRY: Thank you, your Honor.

THE COURT: I think I had said April 18. So April 11.

Any objection?

MS. FIFIELD: No objection.

THE COURT: Without objection, April 11th, 10:00 a.m., will be the pretrial conference for Defendants Kim and Messenger.

Ms. Fifield, do you remember when my pretrial conference date is for Defendant Burke?

MS. FIFIELD: I believe it was January 31st.

THE COURT: Okay. So I want to work backwards from there. January 17th will be the date for any replies in support of motions. That will also be the date that I'll be looking for proposed final jury instructions and preliminary jury instructions and proposed voir dire questions.

I'll look for all of those from the parties by January 17th.

As to the voir dire questions and preliminary jury

instructions, my hope is that the parties will be able to work cooperatively to give joint proposed responses to those. To the extent the parties cannot agree, I'll ask you to just indicate where you disagree and briefly explain why.

I'll send you my standard voir dire questions. I'm certainly happy to consider tweaks to them, but not wholesale rewriting. I try to keep the voir dire pretty quick, so don't be expecting a number of new questions.

So that's all on January 17th.

I think I'll give the parties longer than usual because we've got the holidays there. I'll say December 20th should be your date for any oppositions.

And how about November 22nd as your date for any motions *in limine*, motions to dismiss, 404(b) notices and expert notices. All of those should be filed by November 22nd.

Any questions -- again, that's obviously only as to Defendant Burke.

Any questions about that schedule, Ms. Fifield?

MS. FIFIELD: No questions.

THE COURT: And Mr. Parlatore?

MR. PARLATORE: Just if we can get a quick idea from the Government as to the state of discovery.

THE COURT: Yes. I'll ask them that.

MR. PARLATORE: Because we may -- you know, in

those motions there, you gave a list; but suppression is also going to be potentially an issue in there.

THE COURT: Yes. If I didn't say motions to suppress, that should be in there.

MR. PARLATORE: I wanted to make sure.

THE COURT: Ms. Fifield, why don't you tell us where things stand as to discovery and otherwise where the case is.

MS. FIFIELD: The Government sent out Production 4, I believe, two weeks -- approximately two weeks ago. The Government anticipates one more production, which will be Production 5, which should be sent out on September 30. And that should substantially complete the Government's discovery in this case subject to additional investigation, interviews and the like.

THE COURT: Okay. Ms. Fifield, I'm not thinking we need to do another status conference as to Defendant Burke. Well, does that make sense to you?

MS. FIFIELD: Yes. The Government does not require an additional status conference as to Defendant Burke.

But the Government would be moving to exclude time within which speedy trial must commence, I think, until the deadline -- or the beginning of the briefing schedule, so until November 22nd.

THE COURT: And I take it there's no plea offers that we need to be putting on the record?

MS. FIFIELD: There is nothing to put on the record, your Honor.

THE COURT: Thank you.

Mr. Parlatore, any concerns or responses to any of that?

MR. PARLATORE: That sounds fine, as long as that last production isn't another 3 million pages.

THE COURT: Let's then look for a status conference for the other two Defendants. How about 2:00 p.m. on November 22nd?

Ms. Fifield, does that work for you?

MS. FIFIELD: No objection from the Government.

THE COURT: Mr. Burck, does that work for you?

MR. BURCK: Yes, your Honor.

THE COURT: And Mr. D'Agostino?

MR. D'AGOSTINO: Yes, your Honor. That's the day after Thanksgiving, I believe.

THE COURT: It's a week before Thanksgiving.

MR. D'AGOSTINO: Okay. That's okay.

THE COURT: I think it is.

MR. BURCK: That's right, your Honor.

THE COURT: I definitely did not intend to do a day after Thanksgiving.

MR. D'AGOSTINO: I just wasn't sure. Thank you.

THE COURT: So we'll set as to Defendants Kim and Messenger a 2:00 p.m. status conference on November 22nd.

Ms. Fifield, I think just for the record we should make clear speedy trial is as to those Defendants as well.

MS. FIFIELD: Yes. The Government would move to exclude time from speedy trial as to Kim and Messenger as well.

THE COURT: Mr. Burck, any objection?

MR. BURCK: Your Honor, an objection -- I'm just preserving a prior objection. Of course, the Court has granted us a severance. So just for the record, we would object to that.

THE COURT: Understood.

Mr. D'Agostino?

MR. D'AGOSTINO: No objection.

THE COURT: So I am tolling the speedy trial clock as to Defendant Burke until the start of the briefing schedule.

I do think it sounds like there's another production that is expected to be made as to all Defendants. As Mr. Parlatore referenced a moment ago, I recognize that significant discovery has been going out and that there's a need for all defense attorneys to be able to review it and prepare for it.

I'm also tolling the speedy trial clock as to Defendants Kim and Messenger until the next status conference. I do note I've just granted a severance motion for them, which has required me to push out the trial longer than I expected. But I think that is in recognition of the concerns that they've raised. And of course, the same discovery issues remain with them.

Ms. Fifield, anything further for the Government?

MS. FIFIELD: Nothing further.

THE COURT: Mr. Parlatore?

MR. PARLATORE: No, your Honor.

THE COURT: Mr. Burck?

MR. BURCK: No, your Honor. Thank you.

THE COURT: Mr. D'Agostino?

MR. D'AGOSTINO: No, your Honor.

THE COURT: Thanks.

And, Mr. Burck and Mr. D'Agostino, if you want to waive your clients' presence at the next status conference, that's fine with me.

MR. BURCK: Thank you, your Honor.

THE COURT: Thanks, folks.

(Proceedings concluded.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 24th day of September, 2024.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

## /

**/s** [1] - 57:12

## 1

**1** [1] - 30:1
**1.2** [1] - 40:1
**1000** [1] - 1:19
**10016** [1] - 1:24
**10601** [1] - 2:8
**10:00** [2] - 50:3, 51:11
**10:14** [1] - 1:7
**11** [1] - 51:8
**118** [1] - 28:20
**11th** [1] - 51:11
**1300** [1] - 2:3
**1301** [1] - 1:19
**14** [3] - 33:20, 37:12, 43:19
**167** [1] - 26:5
**17th** [4] - 1:23, 51:18, 51:24, 52:9
**18** [1] - 51:7
**18th** [2] - 50:3, 50:12
**1974** [1] - 28:23
**1999** [1] - 26:6
**19th** [1] - 48:21

## 2

**2** [2] - 30:3, 50:1
**2000** [1] - 28:21
**20001** [2] - 2:12, 57:14
**20005** [1] - 2:4
**202** [2] - 2:13, 57:15
**2021** [6] - 22:16, 23:18, 29:10, 32:24, 32:25
**2022** [2] - 17:8, 23:25
**2024** [2] - 1:6, 57:10
**20530** [2] - 1:17, 1:20
**20th** [1] - 52:12
**22nd** [5] - 52:13, 52:16, 53:25, 54:12, 55:3
**23** [1] - 1:6
**24-00265** [1] - 1:3
**24-265** [1] - 3:2
**24th** [1] - 57:10
**26** [1] - 43:16
**260** [1] - 1:23
**2:00** [2] - 54:11, 55:3

## 3

**3** [31] - 15:21, 15:22, 16:12, 17:4, 17:19, 21:5, 21:6, 21:9, 21:18, 22:6, 22:9, 22:11, 22:12, 30:6, 33:8, 34:5, 34:7, 34:10, 34:12, 34:18, 34:22, 39:23, 39:24, 42:3, 42:9, 42:19, 42:22, 54:9
**30** [1] - 53:12
**302** [2] - 22:13, 22:19
**31st** [1] - 51:16
**333** [2] - 2:11, 57:14
**354-3269** [2] - 2:13, 57:15
**36** [1] - 28:21

## 4

**4** [1] - 53:10
**404(b** [2] - 14:1, 52:14
**44** [1] - 43:17
**445** [1] - 2:7
**494** [1] - 28:22

## 5

**5** [1] - 53:12

## 6

**601** [1] - 1:16
**605** [1] - 2:7
**628** [1] - 26:6
**635** [1] - 26:6
**6706** [1] - 2:12
**6th** [5] - 46:9, 48:14, 49:15, 49:22, 49:25

## 9

**900** [1] - 2:4
**955** [1] - 28:22
**9:00** [1] - 49:25

## A

**a.m** [4] - 1:7, 49:25, 50:3, 51:12
**ability** [1] - 57:7
**able** [6] - 27:4, 27:19, 32:19, 38:11, 52:1, 55:24
**aboveboard** [2] - 33:11, 44:17
**acceptable** [1] - 4:18
**accepting** [1] - 32:8
**accomplished** [1] - 7:18
**according** [1] - 27:20
**accurate** [1] - 57:4
**accuse** [1] - 35:18
**acknowledge** [1] - 19:5
**acknowledging** [1] - 16:2
**acquittal** [1] - 18:21
**acquitted** [3] - 23:3, 23:4, 23:12
**acting** [1] - 44:22
**Action** [1] - 1:3
**adamant** [1] - 6:10
**adding** [1] - 19:15
**additional** [3] - 28:9, 53:14, 53:20
**address** [3] - 3:24, 41:16, 46:15
**addressed** [1] - 39:25
**adequately** [1] - 11:19
**Admiral** [46] - 3:11, 4:20, 7:13, 10:17, 12:15, 12:22, 13:3, 13:9, 14:10, 15:5, 15:15, 16:13, 16:25, 17:4, 18:9, 18:24, 19:2, 19:25, 21:7, 21:9, 21:21, 22:1, 22:6, 22:25, 23:25, 24:5, 24:10, 24:21, 27:8, 31:20, 33:8, 33:15, 36:1, 38:21, 39:6, 39:12, 40:10, 40:11, 40:14, 41:22, 42:4, 42:5, 42:9, 42:13, 42:25, 43:3
**admiral** [2] - 16:1, 20:24
**admissible** [4] - 13:13, 32:16, 32:17, 42:5
**advance** [1] - 13:6
**advantage** [2] - 28:3, 37:6
**afraid** [1] - 5:1
**ago** [2] - 53:10, 55:22
**agree** [4] - 23:20, 33:7, 40:6, 52:3
**agreement** [1] - 7:1
**ahead** [1] - 9:15
**alleged** [3] - 7:17, 12:12, 23:2
**allowed** [1] - 20:4
**almost** [2] - 33:2, 49:5
**alone** [1] - 10:14
**America** [1] - 3:2
**AMERICA** [1] - 1:3
**angle** [1] - 9:17
**answer** [2] - 12:24, 25:14
**antagonistic** [3] - 11:17, 25:15, 29:2
**anticipate** [2] - 31:8, 45:24
**anticipates** [1] - 53:11
**ANTOINETTE** [1] - 1:22
**anyway** [2] - 14:11, 24:14
**apart** [2] - 33:2, 35:18
**appeal** [1] - 35:1
**appear** [1] - 6:21
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:14
**appellate** [1] - 37:24
**appreciated** [1] - 51:4
**approach** [1] - 37:5
**April** [10] - 29:6, 29:10, 29:13, 32:24, 49:15, 50:3, 50:12, 51:7, 51:11
**argue** [1] - 33:10
**arguing** [2] - 8:16, 32:17
**argument** [7] - 4:13, 5:1, 27:15, 27:18, 31:9, 33:14, 44:19
**arguments** [8] - 4:7, 4:10, 5:5, 8:14, 10:9, 25:11, 39:3, 45:13
**arrangement** [2] - 26:21, 33:2
**arrest** [1] - 44:7
**aside** [3] - 29:7, 32:9, 34:2
**aspects** [1] - 14:18
**aspirational** [1] - 40:7
**attack** [1] - 18:14
**attacking** [1] - 6:6
**attempted** [3] - 39:5, 39:7, 45:3
**attendance** [1] - 29:12
**attorney** [2] - 3:19, 7:19
**ATTORNEY'S** [1] - 1:15
**attorneys** [2] - 25:16, 55:24
**AUSA** [1] - 3:8
**authorization** [2] - 39:17, 39:18
**available** [3] - 34:23, 34:25, 46:2
**Avenue** [5] - 1:19, 1:23, 2:7, 2:11, 57:14
**Avi** [2] - 3:16, 51:1
**AVI** [1] - 2:2
**avoid** [1] - 31:24
**aware** [2] - 14:1, 14:3

## B

**backwards** [1] - 51:17
**bad** [1] - 20:15
**baiting** [1] - 35:18
**based** [6] - 26:3, 27:15, 34:23, 39:3, 44:2
**basis** [4] - 4:4, 33:18, 35:2, 44:8
**becomes** [1] - 18:10
**BEFORE** [1] - 1:11
**begin** [1] - 39:19
**beginning** [4] - 10:16, 24:19, 26:24, 53:24
**begins** [1] - 4:25
**behalf** [3] - 3:7, 3:11, 51:1
**belabor** [1] - 23:22
**belief** [1] - 33:13
**bench** [1] - 46:17
**benefit** [1] - 30:5
**benefits** [1] - 34:23
**best** [3] - 4:13, 5:1, 57:7
**better** [1] - 13:4
**between** [11] - 4:12, 5:5, 16:11, 17:3, 21:9, 22:6, 24:16, 32:23, 42:3, 42:9, 44:12
**Beyler** [4] - 21:4, 21:17, 29:9, 29:11
**big** [3] - 6:19, 24:8, 49:3
**bit** [2] - 11:23, 38:21
**board** [2] - 24:10, 24:11
**borne** [1] - 21:8
**bribe** [2] - 20:4, 45:8

**bribery** [11] - 20:3, 20:8, 20:11, 23:7, 23:10, 23:12, 39:5, 39:8, 44:20, 45:3
**brief** [6] - 3:24, 9:6, 14:14, 21:7, 26:17, 37:8
**briefing** [7] - 22:12, 50:13, 50:15, 50:18, 50:20, 53:24, 55:18
**briefings** [1] - 5:4
**briefly** [2] - 48:16, 52:4
**bring** [1] - 15:7
**bringing** [1] - 37:21
**brought** [2] - 9:15, 24:13
**Bruton** [3] - 3:25, 10:16, 44:6
**BURCK** [27] - 2:2, 3:15, 11:15, 14:12, 15:9, 15:11, 15:17, 15:22, 18:3, 18:6, 20:6, 25:4, 25:7, 41:14, 41:16, 42:17, 48:16, 49:11, 49:14, 49:17, 49:19, 50:8, 54:16, 54:23, 55:10, 56:13, 56:20
**Burck** [27] - 3:16, 9:16, 10:23, 11:14, 11:20, 14:8, 25:6, 26:1, 26:7, 27:7, 27:13, 27:22, 29:7, 29:23, 32:15, 39:4, 40:24, 41:15, 45:18, 48:12, 48:15, 49:16, 50:6, 54:15, 55:9, 56:12, 56:17
**burden** [1] - 44:11
**burke** [1] - 19:25
**Burke** [94] - 3:3, 3:11, 4:19, 4:20, 6:25, 7:13, 10:17, 11:20, 11:21, 12:3, 12:15, 12:23, 13:3, 13:10, 13:14, 14:10, 15:5, 15:6, 15:16, 16:13, 16:25, 17:4, 17:15, 18:9, 18:24, 19:2, 19:8, 19:25, 21:7, 21:9, 21:21, 22:2, 22:6, 22:15, 22:25, 23:4, 23:25, 24:5, 24:10, 24:22, 25:11, 26:2, 26:8, 26:20, 26:22, 26:25, 27:3, 27:8, 27:14, 29:6, 29:15, 30:2, 30:3, 30:12, 31:20, 32:14, 32:17, 33:8, 33:15, 34:7, 34:8, 34:9, 34:12, 34:19, 35:3, 35:10, 35:13, 35:18, 35:21, 36:1, 38:21, 39:7, 39:12, 40:10, 40:11, 40:14, 41:22, 42:4, 42:5, 42:9, 42:13, 42:25, 43:3, 44:11, 46:10, 50:16, 50:20, 51:15, 52:18, 53:18, 53:21, 55:18
**BURKE** [2] - 1:6, 1:22
**Burke's** [4] - 26:16, 34:22, 43:17, 44:7
**bury** [1] - 5:1
**business** [1] - 31:14
**BY** [1] - 2:9

## C

**candid** [1] - 17:19
**cannot** [1] - 52:3
**case** [35] - 5:4, 6:15, 9:1, 9:6, 11:10, 11:19, 13:11, 14:6, 16:7, 17:14, 19:1, 19:2, 21:5, 22:8, 22:10, 24:19, 25:4, 28:19, 31:5, 31:17, 33:24, 36:20, 36:23, 37:15, 37:16, 37:24, 38:5, 38:7, 38:9, 39:9, 40:23, 44:4, 45:3, 53:8, 53:14
**Case** [1] - 3:2
**cases** [7] - 10:4, 29:3, 31:3, 36:14, 38:8, 38:11
**casual** [1] - 34:4
**central** [1] - 22:10
**certain** [2] - 5:9, 10:22
**certainly** [7] - 6:2, 6:23, 20:10, 38:3, 44:22, 44:25, 52:6
**CERTIFICATE** [1] - 57:1
**certify** [1] - 57:4
**cetera** [1] - 12:3
**challenge** [1] - 15:14
**chances** [1] - 27:1
**change** [1] - 9:20
**characterize** [1] - 7:10
**characterizing** [1] - 5:9
**charge** [4] - 23:3, 23:9, 23:10, 44:20
**charged** [7] - 20:17, 21:2, 21:5, 26:12, 38:23, 39:1, 42:1
**charges** [3] - 16:24, 41:21, 41:25
**CHARLIE** [1] - 1:6
**Charlie** [11] - 3:3, 20:21, 30:14, 39:2, 39:4, 39:8, 39:18, 39:22, 40:2, 40:17, 41:4
**check** [1] - 14:5
**cherry** [1] - 14:21
**cherry-pick** [1] - 14:21
**chief** [3] - 9:1, 11:10, 31:5
**choose** [1] - 6:23
**chronic** [1] - 30:15
**circuit** [2] - 36:20, 36:24
**Circuit** [3] - 10:4, 26:6, 28:22
**circular** [1] - 8:19
**circumstance** [1] - 39:10
**cited** [4] - 36:21, 37:16, 37:17, 38:7
**claim** [2] - 36:19, 44:1
**clear** [8] - 12:6, 28:19, 33:24, 34:2, 36:7, 36:16, 44:15, 55:5
**clearer** [1] - 10:3
**clearly** [4] - 17:10, 37:4, 37:15, 40:1
**client** [22] - 4:14, 5:23, 6:4, 6:10, 6:18, 8:21, 10:10, 10:13, 11:19, 12:6, 16:14, 16:18, 19:9, 25:12, 25:22, 25:23, 25:24, 38:17, 45:8, 48:14, 49:16, 49:19
**client's** [2] - 11:5, 15:8
**clients** [10] - 18:18, 21:13, 23:3, 23:8, 24:20, 41:22, 41:25, 42:6, 42:7, 42:10
**clients'** [1] - 56:18
**clock** [2] - 55:17, 56:1
**close** [2] - 37:2, 45:13
**closer** [2] - 4:11, 4:20
**closing** [1] - 8:13
**Co** [30] - 4:16, 5:6, 5:8, 5:12, 6:13, 6:22, 6:23, 7:6, 7:15, 7:24, 8:2, 8:11, 9:21, 10:9, 10:19, 11:4, 19:11, 26:4, 26:10, 26:12, 27:9, 28:4, 33:9, 34:19, 36:13, 36:17, 38:23, 40:4, 41:1, 42:22
**co** [10] - 6:17, 7:17, 14:24, 20:18, 21:3, 35:6, 35:7, 36:11, 42:8, 46:13
**co-conspirator** [3] - 14:24, 36:11, 42:8
**co-conspirators** [3] - 7:17, 20:18, 21:3
**co-counsel** [4] - 6:17, 35:6, 35:7, 46:13
**Co-Defendant** [7] - 5:8, 8:11, 19:11, 26:10, 36:17, 41:1, 42:22
**Co-Defendant's** [2] - 26:4, 28:4
**Co-Defendants** [19] - 4:16, 5:6, 5:12, 6:13, 6:22, 6:23, 7:6, 7:15, 7:24, 8:2, 10:9, 10:19, 11:4, 26:12, 27:9, 33:9, 34:19, 38:23, 40:4
**Co-Defendants'** [2] - 9:21, 36:13
**colleagues** [1] - 4:19
**Columbia** [2] - 2:11, 57:13
**COLUMBIA** [2] - 1:1, 1:16
**coming** [4] - 24:10, 24:11, 26:15, 34:10
**commence** [1] - 53:23
**commit** [2] - 13:23, 26:12
**commitment** [1] - 33:4
**committed** [5] - 6:1, 6:9, 6:10, 26:10, 38:23
**committing** [1] - 8:7
**communications** [4] - 15:5, 15:8, 24:7, 36:10
**Company** [13] - 29:22, 30:2, 30:3, 30:5, 30:8, 30:12, 30:16, 30:18, 30:22, 30:25, 34:6, 34:10, 34:23
**comparable** [1] - 36:21
**complain** [1] - 28:1
**complaint** [1] - 26:15
**complete** [2] - 53:13, 57:6
**compromised** [1] - 25:20
**compromises** [2] - 32:5, 32:6
**concealed** [1] - 26:20
**concealment** [1] - 26:16
**concern** [2] - 10:8, 44:5
**concerned** [2] - 31:15, 31:18
**concerns** [6] - 20:19, 25:16, 25:18, 44:6, 54:6, 56:6
**concluded** [1] - 56:22
**conclusion** [1] - 8:2
**conducted** [1] - 37:19
**confer** [1] - 35:5
**conference** [12] - 46:17, 50:2, 50:12, 50:21, 51:12, 51:15, 53:17, 53:20, 54:11, 55:3, 56:3, 56:18
**CONFERENCE** [1] - 1:11
**confers** [3] - 35:7, 46:13, 49:19
**confessions** [2] - 5:9, 29:5
**confidential** [1] - 30:11
**conflict** [3] - 28:7, 44:24, 51:3
**Conflicting** [1] - 26:18
**conflicts** [2] - 27:25, 44:12
**confusing** [2] - 5:14, 8:1
**confusion** [1] - 24:3
**connection** [1] - 35:2
**consider** [3] - 41:3, 43:10, 52:6
**consolidation** [1] - 43:21
**conspiracy** [14] - 12:12, 19:18, 20:17, 23:2, 23:3, 23:6, 23:9, 23:12, 26:19, 26:21,

28:25, 32:12, 33:4
**conspirator** [3] - 14:24, 36:11, 42:8
**conspirators** [3] - 7:17, 20:18, 21:3
**constantly** [1] - 21:25
**constitutes** [1] - 57:4
**Constitution** [2] - 2:11, 57:14
**CONT'D** [1] - 2:1
**contemporaneous** [4] - 15:5, 19:7, 20:13, 21:8
**context** [2] - 5:25, 7:6
**continuance** [1] - 46:6
**continued** [1] - 48:9
**contract** [10] - 7:1, 16:1, 16:3, 26:25, 30:2, 35:10, 35:15, 35:19, 35:22, 44:18
**contractor** [2] - 7:2, 12:16
**contractors** [1] - 16:5
**contracts** [2] - 27:2, 30:5
**contrary** [1] - 29:23
**contrast** [2] - 16:15, 43:3
**conversation** [6] - 21:4, 29:13, 33:7, 39:13, 43:4, 43:5
**conversations** [10] - 17:19, 19:20, 21:3, 23:16, 26:23, 29:8, 32:22, 32:24, 39:10, 39:12
**convicted** [3] - 23:8, 23:11, 41:12
**conviction** [2] - 37:20, 38:2
**convince** [1] - 34:9
**convinced** [1] - 4:9
**convincing** [1] - 34:8
**cooperate** [1] - 5:20
**cooperating** [1] - 8:9
**cooperatively** [1] - 52:2
**cooperator** [2] - 7:16, 8:15
**correct** [2] - 5:22, 10:1
**correctly** [4] - 5:24, 10:16, 38:7, 40:15
**corroborate** [1] - 24:25
**corrupt** [6] - 12:22, 20:7, 29:16, 35:12, 35:21, 44:21
**Counsel** [1] - 3:4
**counsel** [6] - 3:8, 6:17, 35:6, 35:7, 46:1, 46:13
**counts** [3] - 13:14, 33:23, 43:23
**couple** [2] - 22:20, 33:2
**course** [14] - 4:15, 5:10, 12:8, 16:4, 16:8, 19:6, 23:5, 41:23, 43:3, 45:15, 46:1, 48:22, 55:11, 56:6
**COURT** [89] - 1:1, 3:9, 3:13, 3:17, 3:20, 5:22, 6:14, 7:14, 8:21, 9:2, 9:5, 9:9, 10:8, 11:5, 11:13, 14:8, 15:7, 15:10, 15:15, 15:21, 17:23, 18:5, 20:1, 25:3, 25:6, 25:8, 27:6, 28:15, 31:1, 31:7, 31:13, 31:15, 33:6, 33:19, 34:16, 35:4, 35:23, 36:23, 37:7, 38:12, 38:16, 41:13, 41:15, 42:16, 43:8, 43:12, 43:15, 46:3, 46:8, 46:16, 48:6, 49:8, 49:12, 49:15, 49:18, 49:21, 49:24, 50:6, 50:9, 50:11, 50:19, 50:23, 50:25, 51:5, 51:7, 51:11, 51:17, 52:21, 52:24, 53:3, 53:6, 53:16, 54:1, 54:5, 54:10, 54:15, 54:17, 54:20, 54:22, 54:24, 55:2, 55:9, 55:14, 55:17, 56:10, 56:12, 56:14, 56:16, 56:21
**court** [1] - 48:5
**Court** [13] - 2:10, 2:10, 28:21, 30:13, 33:22, 37:23, 43:15, 43:22, 48:24, 50:17, 55:11, 57:12, 57:13
**Court's** [1] - 27:24
**COURTROOM** [1] - 3:1
**Courtroom** [1] - 50:1
**courts** [1] - 37:4
**crazy** [3] - 19:17, 19:21, 24:22
**create** [1] - 18:13
**created** [2] - 32:3, 32:4
**creating** [1] - 5:13
**credibility** [5] - 6:5, 6:6, 18:14, 18:15, 39:24
**crime** [6] - 6:1, 6:10, 6:11, 26:10, 38:23, 45:4
**crimes** [1] - 26:12
**criminal** [4] - 14:1, 19:18, 20:10, 20:14
**Criminal** [2] - 1:3, 3:2
**critical** [2] - 13:3, 21:25
**cross** [10] - 7:8, 7:22, 7:24, 8:5, 8:9, 8:11, 11:2, 22:22, 26:8, 26:11
**cross-examination** [1] - 7:8
**cross-examinations** [1] - 11:2
**cross-examine** [2] - 22:22, 26:8
**cross-examining** [6] - 7:22, 7:24, 8:5, 8:9, 8:11, 26:11
**CRR** [3] - 2:9, 57:3, 57:12

## D

**D'Agostino** [9] - 3:19, 3:20, 48:12, 49:21, 50:9, 54:17, 55:15, 56:14, 56:17
**D'AGOSTINO** [10] - 2:6, 2:6, 3:18, 49:22, 50:10, 54:18, 54:21, 55:1, 55:16, 56:15
**D.C** [9] - 1:6, 1:17, 1:20, 2:4, 2:12, 26:6, 28:21, 28:22, 57:14
**Damaging** [1] - 26:17
**date** [8] - 45:23, 48:11, 49:6, 51:15, 51:18, 51:19, 52:12, 52:13
**Dated** [1] - 57:10
**dates** [1] - 48:25
**days** [3] - 31:12, 31:13, 31:14
**deadline** [1] - 53:24
**deal** [9] - 9:23, 15:25, 17:5, 17:6, 24:8, 29:17, 34:8, 35:14, 36:9
**dealings** [1] - 24:7
**deceived** [1] - 42:8
**December** [2] - 45:25, 52:11
**decide** [3] - 8:25, 37:20, 49:12
**decidedly** [1] - 44:4
**decision** [2] - 8:22, 45:12
**decisions** [1] - 16:6
**declarant** [1] - 6:6
**declare** [1] - 31:21
**decline** [1] - 10:21
**defeats** [1] - 25:14
**defend** [1] - 11:19
**DEFENDANT** [3] - 1:21, 2:2, 2:6
**Defendant** [32] - 5:8, 5:18, 8:11, 11:20, 19:11, 25:11, 25:13, 26:2, 26:8, 26:10, 27:3, 29:6, 29:14, 32:17, 33:21, 34:19, 34:22, 36:17, 41:1, 42:22, 43:17, 43:21, 44:7, 44:11, 46:10, 50:15, 50:20, 51:15, 52:18, 53:17, 53:20, 55:18
**defendant's** [2] - 32:5, 32:7
**Defendant's** [3] - 26:4, 28:4, 29:2
**Defendants** [53] - 1:8, 4:16, 5:6, 5:12, 5:17, 6:13, 6:22, 6:23, 7:6, 7:15, 7:24, 8:2, 10:9, 10:19, 11:4, 25:17, 25:18, 26:1, 26:3, 26:9, 26:12, 27:7, 27:9, 27:25, 32:10, 32:11, 32:21, 33:3, 33:9, 33:21, 34:19, 36:12, 36:21, 38:23, 40:4, 41:11, 43:16, 43:20, 43:25, 44:6, 44:10, 44:14, 45:2, 45:7, 46:5, 48:20, 49:24, 51:12, 54:11, 55:2, 55:5, 55:21, 56:2
**Defendants'** [5] - 9:21, 26:20, 36:13, 43:18, 43:23
**defense** [22] - 4:14, 6:7, 7:2, 7:18, 12:3, 12:16, 19:3, 20:4, 20:21, 22:1, 33:14, 35:24, 40:25, 41:3, 41:5, 41:10, 44:18, 44:20, 45:10, 45:16, 48:23, 55:24
**Defenses** [1] - 26:18
**defenses** [6] - 4:12, 8:3, 11:17, 25:15, 29:2, 40:21
**defer** [1] - 10:23
**definitely** [2] - 9:21, 54:24
**degree** [2] - 28:7, 32:4
**denied** [1] - 38:3
**DEPARTMENT** [1] - 1:18
**DEPUTY** [1] - 3:1
**describe** [1] - 44:23
**desire** [1] - 26:4
**detail** [1] - 19:20
**determination** [1] - 14:6
**diametrically** [2] - 8:3, 16:16
**differences** [1] - 4:12
**different** [12] - 7:16, 7:20, 9:17, 23:2, 25:2, 36:14, 37:17, 37:18, 38:6, 38:10, 39:22, 40:2
**differently** [1] - 12:7
**differing** [2] - 5:4, 11:2
**difficult** [1] - 31:16
**dire** [4] - 51:21, 51:25, 52:5, 52:7
**direct** [1] - 30:2
**directing** [1] - 26:24
**directly** [1] - 16:3
**disagree** [1] - 52:4
**disclosed** [1] - 26:22
**discovery** [7] - 11:25, 20:19, 52:23, 53:7, 53:14, 55:23, 56:7
**discretion** [3] - 37:13, 37:25, 38:4
**discussed** [1] - 40:23
**discussing** [1] - 21:18
**discussion** [3] - 6:25, 12:22, 42:24
**discussions** [23] - 12:4, 12:8, 12:9, 12:10, 12:11, 12:14, 13:17, 13:20, 15:6, 15:25, 16:5, 16:18, 16:19, 16:23, 17:8, 17:9, 17:11, 17:13, 19:5, 19:9, 23:19, 24:1, 39:19

**dismiss** [1] - 52:14
**DISTRICT** [4] - 1:1, 1:1, 1:12, 1:16
**District** [4] - 2:10, 2:11, 28:21, 57:13
**district** [1] - 57:13
**disturb** [1] - 37:20
**doctrine** [1] - 29:3
**document** [1] - 23:25
**documents** [3] - 16:8, 24:4, 25:1
**DOD** [1] - 33:11
**down** [1] - 8:5
**dozen** [1] - 30:23
**drastic** [1] - 9:11
**draw** [1] - 43:9
**dream** [1] - 5:16
**drinks** [1] - 34:11
**during** [3] - 4:15, 5:7, 10:20

## E

**early** [3] - 12:1, 21:4, 45:18
**ECF** [2] - 43:15, 43:17
**Edelin** [1] - 28:20
**EDELIN** [1] - 28:20
**Edwards** [1] - 57:12
**EDWARDS** [2] - 2:9, 57:3
**effectively** [1] - 19:25
**effort** [1] - 30:4
**either** [4] - 16:3, 28:14, 38:11, 38:22
**elaborated** [1] - 29:19
**elicited** [1] - 6:16
**email** [6] - 29:15, 29:19, 29:20, 30:10, 35:16
**emails** [13] - 6:3, 14:13, 19:7, 19:19, 20:14, 27:22, 29:22, 29:24, 30:1, 30:8, 30:15, 30:17
**EMANUEL** [1] - 2:3
**employee** [2] - 27:4, 30:25
**employees** [3] - 12:19, 21:16, 30:23
**employment** [3] - 4:16, 26:23, 34:22
**end** [14] - 8:13, 19:3, 19:10, 24:20, 31:17, 31:19, 37:24, 38:1, 40:14, 40:23, 40:25, 41:6, 41:11, 45:1
**engage** [1] - 35:21
**engaged** [4] - 13:17, 13:20, 19:18, 39:4
**engaging** [1] - 27:3
**enter** [3] - 25:22, 25:23, 27:23
**entering** [1] - 27:10
**entire** [2] - 8:6, 20:24
**entirely** [1] - 25:15
**entitle** [2] - 25:18, 28:2
**entitled** [6] - 26:3, 28:2, 28:3, 28:5, 36:6, 36:7
**equally** [1] - 32:11
**especially** [4] - 4:12, 18:15, 20:13, 30:16
**ESQ** [7] - 1:15, 1:18, 1:21, 1:22, 2:2, 2:2, 2:6
**essentially** [3] - 8:7, 12:4, 29:5
**established** [1] - 36:12
**et** [1] - 12:3
**events** [1] - 5:19
**evidence** [67] - 4:7, 4:8, 6:16, 6:20, 7:4, 10:11, 10:19, 12:9, 12:25, 13:2, 13:8, 13:10, 13:12, 13:15, 15:2, 17:1, 18:15, 19:12, 20:2, 20:13, 22:21, 23:13, 23:23, 25:21, 26:15, 27:10, 27:11, 28:9, 28:13, 28:18, 28:24, 29:1, 29:4, 29:12, 29:14, 29:24, 30:13, 31:11, 32:10, 32:14, 32:16, 32:20, 32:21, 33:7, 33:12, 34:3, 34:7, 34:12, 34:21, 35:1, 35:8, 35:11, 35:12, 36:10, 39:3, 39:11, 39:15, 39:16, 39:20, 40:4, 41:24, 42:10, 44:2, 44:13, 45:14
**Evidence** [1] - 26:17
**evidentiary** [1] - 15:14
**ex** [2] - 46:15, 48:7
**exact** [1] - 36:9
**exactly** [11] - 5:7, 7:3, 7:25, 8:4, 15:4, 15:19, 18:9, 19:16, 19:20, 45:16
**examination** [1] - 7:8
**examinations** [1] - 11:2
**examine** [2] - 22:22, 26:8
**examined** [1] - 10:5
**examining** [6] - 7:22, 7:24, 8:5, 8:9, 8:11, 26:11
**example** [2] - 15:12, 28:8
**exception** [2] - 15:12, 36:13
**exchange** [3] - 35:10, 35:21
**exclude** [2] - 53:22, 55:7
**excluded** [1] - 42:2
**exercised** [1] - 37:25
**exhibit** [1] - 10:18
**exhibits** [3] - 7:11, 11:3, 14:14
**expect** [5] - 5:22, 6:16, 7:8, 31:3, 31:4
**expected** [2] - 55:21, 56:5
**expecting** [5] - 10:12, 14:9, 15:7, 25:12, 52:8
**expects** [3] - 25:25, 26:1, 45:16
**expense** [1] - 28:13
**expert** [1] - 52:15
**explain** [2] - 21:6, 52:4
**explaining** [1] - 19:24
**explicitly** [3] - 23:17, 29:3, 30:8
**extending** [1] - 49:4
**extensive** [1] - 11:1
**extent** [7] - 6:3, 10:22, 17:18, 21:23, 22:22, 45:6, 52:3
**extreme** [4] - 32:3, 32:5, 36:18, 37:5
**extremely** [3] - 5:14, 19:10, 22:1

## F

**F.2d** [1] - 28:22
**F.3d** [1] - 26:5
**F.Supp.2d** [1] - 28:20
**face** [1] - 42:7
**fact** [11] - 10:2, 12:8, 13:16, 13:17, 13:19, 16:19, 19:7, 24:10, 33:1, 41:1, 42:7
**facts** [5] - 36:21, 36:22, 38:5, 38:7, 38:9
**fair** [3] - 8:23, 8:24, 32:7
**fall** [1] - 35:18
**Far** [1] - 26:17
**far** [3] - 6:8, 20:18, 49:7
**fault** [1] - 18:19
**favor** [1] - 31:9
**favors** [1] - 31:17
**February** [1] - 48:21
**feed** [1] - 33:13
**fell** [1] - 33:2
**felt** [1] - 29:16
**Fifield** [18] - 3:7, 20:1, 25:8, 28:15, 31:1, 35:4, 37:7, 38:6, 40:6, 45:21, 46:11, 51:14, 52:19, 53:6, 53:16, 54:13, 55:4, 56:8
**fifield** [1] - 50:16
**FIFIELD** [29] - 1:18, 3:6, 25:9, 27:13, 28:18, 31:6, 31:8, 31:14, 31:25, 33:17, 33:24, 34:20, 35:5, 36:4, 36:25, 45:23, 46:12, 50:5, 50:17, 50:22, 51:10, 51:16, 52:20, 53:9, 53:19, 54:3, 54:14, 55:6, 56:9
**filed** [2] - 11:23, 52:15
**filing** [1] - 9:6
**filings** [1] - 16:10
**final** [1] - 51:20
**fine** [5] - 12:16, 24:17, 51:5, 54:8, 56:19
**finger** [13] - 5:17, 5:23, 6:8, 6:24, 10:10, 18:8, 24:21, 25:13, 28:16, 38:19, 38:22, 38:25, 45:7
**fingers** [2] - 5:13, 45:11
**firing** [1] - 8:19
**firmly** [1] - 45:23
**first** [8] - 4:23, 9:25, 29:11, 29:17, 35:14, 44:1, 45:24, 49:13
**Floor** [1] - 1:23
**focus** [2] - 4:5, 4:22
**foiled** [1] - 27:1
**folks** [3] - 3:9, 3:17, 56:21
**following** [3] - 43:14, 46:17, 48:4
**fooled** [1] - 33:10
**FOR** [6] - 1:1, 1:15, 1:16, 1:21, 2:2, 2:6
**forego** [1] - 22:5
**foregoing** [1] - 57:4
**former** [1] - 30:4
**forth** [1] - 8:16
**forward** [3] - 3:4, 4:2, 36:1
**four** [2] - 13:13, 20:24
**four-star** [1] - 20:24
**frankly** [4] - 4:8, 7:16, 11:9, 38:13
**frequently** [1] - 37:3
**Friday** [1] - 50:3
**front** [2] - 22:15, 31:16
**full** [1] - 57:5
**furthermore** [1] - 26:9
**future** [1] - 30:5

## G

**generally** [1] - 16:4
**Gilliam** [1] - 26:5
**GILLIAM** [1] - 26:5
**given** [4] - 4:18, 17:20, 41:20, 45:13
**goal** [1] - 27:3
**GOVERNMENT** [1] - 1:15
**Government** [45] - 3:5, 4:2, 5:19, 6:4, 7:22, 8:14, 8:15, 10:21, 11:10, 13:2, 13:10, 14:11, 14:18, 15:2, 15:14, 15:18, 19:12, 22:5, 22:13, 23:1, 23:14, 27:23, 29:24, 33:15, 33:22, 37:6, 39:6, 39:21, 41:17, 42:20, 43:22, 45:5, 46:1, 46:11, 48:18, 48:25, 50:4, 52:23, 53:9, 53:11, 53:19, 53:22, 54:14, 55:6, 56:8
**Government's** [19] - 5:16, 7:9, 7:11, 9:1, 11:2, 11:3, 14:6, 14:19, 16:7, 16:10, 31:4, 31:9, 41:23, 43:18, 44:19, 45:22, 48:7, 49:3, 53:13
**granted** [3] - 49:10, 55:12, 56:3

**great** [4] - 12:17, 18:17, 33:25, 50:23
**GROUP** [1] - 1:22
**guess** [2] - 5:15, 9:22
**guilt** [1] - 29:2
**guilty** [3] - 28:25, 40:22, 45:2
**gun** [2] - 28:10, 28:11
**guy** [1] - 8:5
**Guy** [2] - 28:9, 28:10
**guys** [1] - 28:8

**H**

**habitually** [1] - 17:16
**halfway** [1] - 31:19
**Hamilton** [1] - 2:7
**hand** [1] - 16:17
**happy** [2] - 4:23, 52:6
**hard** [1] - 14:13
**head** [3] - 25:10, 27:17, 37:11
**headquarters** [1] - 34:25
**hear** [4] - 4:23, 18:25, 21:14, 21:22
**heard** [2] - 27:22, 48:16
**hearing** [6] - 4:9, 8:25, 10:8, 10:9, 27:6, 35:24
**hearsay** [2] - 14:23, 15:12
**heart** [1] - 22:8
**held** [1] - 46:18
**help** [2] - 30:4, 40:11
**helpful** [2] - 20:2, 22:24
**hereby** [1] - 57:3
**high** [1] - 33:11
**high-profile** [1] - 33:11
**highlight** [1] - 42:20
**highlighting** [1] - 24:9
**himself** [1] - 11:19
**hire** [1] - 16:6
**hired** [2] - 34:19, 34:20
**history** [1] - 14:1
**hit** [2] - 25:10, 37:11
**holidays** [1] - 52:11
**honestly** [1] - 40:15
**Honor** [59] - 3:1, 3:6, 3:10, 3:15, 3:18, 4:25, 10:15, 11:15, 11:16, 11:23, 13:23, 14:12, 15:9, 15:13, 15:17, 16:9, 17:3, 18:3, 19:19, 20:6, 21:6, 22:11, 23:22, 25:5, 25:7, 25:9, 31:25, 37:11, 37:13, 38:3, 41:16, 42:14, 42:18, 43:11, 46:7, 46:12, 46:14, 48:16, 48:18, 49:11, 49:14, 49:17, 49:20, 49:22, 50:5, 50:8, 50:10, 50:22, 50:24, 51:6, 54:4, 54:16, 54:18, 54:23, 55:10, 56:11, 56:13, 56:15, 56:20
**HONORABLE** [1] - 1:11
**hope** [2] - 40:7, 52:1
**hoping** [1] - 40:10
**hostile** [1] - 28:5
**houses** [1] - 18:22
**hundreds** [2] - 19:19, 29:25
**hypothetical** [4] - 9:18, 32:8, 32:9, 38:12

**I**

**idea** [5] - 6:20, 7:14, 14:22, 27:12, 52:22
**identical** [1] - 31:11
**identify** [1] - 3:4
**illustrates** [1] - 5:6
**imagine** [1] - 20:1
**important** [1] - 26:14
**importantly** [1] - 29:10
**impression** [1] - 22:17
**improper** [2] - 8:2, 27:18
**improperly** [1] - 40:22
**inapplicable** [1] - 29:3
**incentive** [2] - 18:13, 44:23
**inchoate** [1] - 45:4
**inclination** [1] - 14:7
**inclined** [4] - 9:3, 13:24, 13:25, 14:4
**include** [2] - 11:1, 30:24
**included** [2] - 14:14, 29:14
**includes** [1] - 30:16
**including** [4] - 15:18, 21:17, 42:10, 49:1
**inconsistent** [2] - 34:3, 45:9
**incriminating** [1] - 42:4
**inculpate** [1] - 11:20
**inculpating** [1] - 14:23
**indeed** [1] - 45:9
**independent** [5] - 28:13, 28:18, 28:24, 29:1, 41:21
**independently** [1] - 32:11
**indicate** [1] - 52:4
**indicia** [1] - 4:18
**indictment** [8] - 13:14, 14:19, 16:24, 26:13, 33:21, 38:24, 43:20, 49:5
**Individual** [1] - 39:23
**informate** [1] - 30:18
**informating** [1] - 30:18
**information** [1] - 43:20
**initial** [1] - 43:25
**instance** [2] - 7:16, 27:15
**instances** [2] - 27:16, 27:19
**instead** [2] - 31:4, 40:18
**instruction** [1] - 45:5
**instructions** [4] - 40:24, 51:20, 51:21, 52:1
**integral** [1] - 27:2
**intend** [3] - 6:20, 27:14, 54:24
**intent** [7] - 12:21, 12:22, 20:7, 20:15, 29:16, 35:13, 44:21
**intention** [2] - 15:1, 41:23
**interactions** [1] - 13:9
**interest** [1] - 6:5
**interested** [1] - 4:9
**interests** [1] - 13:6
**internal** [4] - 24:8, 29:22, 30:19, 30:22
**interview** [2] - 10:17, 11:6
**interviews** [1] - 53:15
**intimate** [2] - 34:4, 34:13
**introduce** [5] - 6:20, 10:24, 11:10, 14:9, 15:1
**introduced** [2] - 6:4, 11:4
**investigation** [2] - 24:12, 53:14
**investors** [7] - 12:18, 14:16, 21:16, 30:9, 30:10, 39:1, 39:2
**involve** [1] - 46:1
**involved** [1] - 24:15
**involving** [1] - 44:6
**irreconcilable** [3] - 4:12, 44:12, 45:10
**irreconcilably** [1] - 6:12
**issue** [15] - 5:14, 10:16, 11:16, 12:20, 13:3, 16:19, 18:22, 18:23, 19:8, 19:10, 24:8, 24:16, 41:18, 46:14, 53:2
**issues** [7] - 6:2, 11:11, 14:2, 14:3, 39:24, 41:17, 56:7
**it'll** [1] - 19:2
**itself** [1] - 13:3

**J**

**Jackson** [1] - 45:25
**jail** [1] - 39:8
**January** [4] - 51:16, 51:18, 51:24, 52:9
**job** [21] - 7:1, 12:5, 13:17, 15:6, 16:5, 17:5, 17:6, 21:18, 22:15, 24:1, 24:13, 24:14, 29:17, 34:14, 35:10, 35:14, 35:16, 35:19, 35:22, 42:24, 42:25
**join** [2] - 27:4, 48:19
**joinder** [2] - 33:20, 43:19
**joined** [1] - 3:11
**joining** [1] - 30:12
**joint** [4] - 4:2, 10:12, 43:16, 52:2
**JOSHUA** [1] - 1:15
**Joshua** [1] - 3:8
**Judge** [2] - 9:13, 11:8
**JUDGE** [1] - 1:12
**judge** [1] - 41:9
**Juliette** [1] - 29:9
**July** [5] - 11:24, 22:16, 29:21, 30:10, 32:25
**Jump** [1] - 24:7
**Jump's** [1] - 27:1
**jury** [14] - 5:14, 7:25, 8:7, 20:12, 28:12, 40:15, 40:22, 40:23, 41:2, 41:8, 49:25, 51:20, 51:21, 51:25
**JUSTICE** [1] - 1:18
**justice** [1] - 43:24
**justification** [1] - 30:17
**justify** [1] - 36:17

**K**

**Kathryn** [1] - 3:6
**KATHRYN** [1] - 1:18
**keep** [8] - 9:4, 17:24, 26:4, 28:4, 30:11, 36:6, 46:4, 52:7
**key** [1] - 28:19
**KIM** [2] - 1:6, 2:2
**Kim** [59] - 3:3, 3:16, 6:3, 12:9, 13:9, 13:13, 13:19, 13:22, 14:15, 14:20, 15:24, 17:5, 17:11, 17:17, 17:21, 18:16, 21:1, 21:11, 22:4, 22:14, 22:18, 23:20, 24:2, 24:20, 26:14, 26:23, 27:21, 29:5, 29:15, 29:17, 29:19, 30:1, 30:14, 32:14, 32:18, 34:5, 34:21, 35:9, 39:2, 39:4, 39:8, 39:18, 39:22, 40:2, 40:17, 42:12, 42:23, 44:6, 44:14, 45:2, 45:7, 46:5, 49:24, 51:1, 51:12, 55:2, 55:7, 56:2
**Kim's** [3] - 20:21, 41:4, 43:16
**kind** [10] - 4:8, 5:13, 5:15, 8:13, 8:18, 9:10, 17:12, 27:11, 33:8, 38:13
**kinds** [1] - 22:7
**knows** [1] - 13:9

**L**

**lack** [1] - 13:4
**largely** [1] - 17:14
**last** [5] - 22:11, 31:5, 37:8, 42:18, 54:9
**lastly** [1] - 35:8
**late** [1] - 3:25

**law** [16] - 9:7, 20:10, 28:19, 31:17, 32:1, 32:2, 33:24, 36:7, 36:16, 36:23, 37:6, 37:16, 37:24, 44:4, 45:3
**LAW** [2] - 1:22, 2:6
**lawyers** [1] - 49:3
**lead** [2] - 8:1, 18:21
**least** [3] - 18:25, 23:5, 34:22
**legal** [1] - 34:2
**legion** [2] - 16:11, 22:7
**length** [4] - 31:11, 41:18, 41:20, 42:14
**lens** [1] - 36:4
**Leonard** [1] - 28:22
**less** [1] - 44:25
**level** [1] - 24:3
**liability** [3] - 20:9, 20:10, 20:11
**liar** [9] - 18:12, 19:25, 27:14, 32:18, 33:15, 44:16, 44:23
**lied** [14] - 17:16, 17:17, 18:20, 19:16, 21:7, 27:15, 27:20, 27:21, 32:18, 38:25, 39:2
**lies** [4] - 13:5, 14:9, 17:16, 23:17
**light** [1] - 48:7
**lightly** [1] - 45:12
**likely** [1] - 14:11
**limine** [1] - 52:14
**line** [1] - 43:9
**LISA** [2] - 2:9, 57:3
**Lisa** [1] - 57:12
**list** [1] - 53:1
**listen** [2] - 12:11, 12:19
**listening** [1] - 27:17
**listservs** [1] - 30:24
**literally** [2] - 20:15, 22:4
**LLP** [1] - 1:22
**location** [1] - 34:13
**look** [7] - 5:3, 20:12, 37:19, 46:4, 48:12, 51:23, 54:10
**looked** [3] - 10:2, 36:19, 36:20
**looking** [3] - 24:6, 46:6, 51:20
**looks** [2] - 14:6, 46:8
**lunch** [6] - 22:16, 33:7, 34:4, 34:5, 34:13, 42:24
**lying** [4] - 15:16, 27:8, 27:9, 32:14

## M

**Madison** [1] - 1:23
**mandate** [2] - 33:25, 34:1
**manifest** [1] - 40:9
**markedly** [3] - 38:5, 38:9, 38:10
**massage** [1] - 34:24
**mastermind** [1] - 20:15
**matches** [1] - 5:19
**matter** [1] - 43:25
**McFADDEN** [1] - 1:11
**mean** [5] - 4:1, 22:7, 31:2, 31:23, 38:24
**meanwhile** [1] - 16:20
**meeting** [9] - 29:6, 29:11, 29:14, 29:21, 30:11, 32:23, 40:3, 42:11
**meetings** [1] - 29:10
**MEGHAN** [1] - 1:6
**Meghan** [4] - 3:3, 3:19, 29:18, 34:14
**members** [2] - 21:2, 28:25
**men** [1] - 38:13
**mentioned** [1] - 42:20
**messages** [6] - 16:11, 21:9, 22:6, 34:15, 35:15
**MESSENGER** [2] - 1:7, 2:6
**Messenger** [44] - 3:3, 3:19, 3:21, 6:3, 13:13, 13:19, 14:15, 15:24, 16:14, 17:12, 17:17, 17:21, 21:11, 22:14, 22:19, 23:20, 24:2, 24:21, 26:14, 26:23, 27:21, 29:5, 29:15, 29:18, 32:15, 32:18, 34:5, 34:14, 34:21, 35:9, 35:15, 40:17, 42:12, 44:6, 44:14, 45:2, 45:7, 46:5, 49:25, 51:13, 55:3, 55:7, 56:2
**Messenger's** [3] - 30:19, 42:23, 43:16
**messengers** [1] - 17:3
**met** [1] - 44:11
**might** [5] - 9:11, 9:12, 14:21, 18:20, 23:11
**military** [2] - 21:2, 30:4
**million** [2] - 40:1, 54:9
**mind** [5] - 12:21, 15:12, 20:22, 41:4, 48:8
**minds** [2] - 21:15, 32:23
**minute** [1] - 31:2
**misbalance** [1] - 4:8
**mislead** [1] - 21:25
**misleading** [3] - 13:16, 17:11, 17:12
**misleads** [1] - 13:5
**misled** [1] - 21:19
**mismatch** [1] - 44:2
**Mississippi** [1] - 45:25
**mistrial** [1] - 31:21
**moment** [5] - 35:5, 43:10, 46:12, 49:17, 55:22
**morning** [10] - 3:6, 3:9, 3:10, 3:13, 3:14, 3:15, 3:17, 3:18, 3:20, 3:21
**most** [5] - 7:4, 7:5, 11:24, 19:2, 19:3
**motion** [9] - 3:22, 3:25, 11:23, 18:2, 38:3, 43:16, 43:17, 44:11, 56:3
**motions** [5] - 51:19, 52:14, 53:1, 53:3
**mountain** [2] - 19:12, 19:13
**move** [1] - 55:6
**moving** [1] - 53:22
**MR** [59] - 3:10, 3:15, 3:18, 4:25, 5:25, 6:19, 7:21, 8:24, 9:3, 9:8, 9:13, 10:15, 11:8, 11:15, 14:12, 15:9, 15:11, 15:17, 15:22, 18:3, 18:6, 20:6, 25:4, 25:7, 37:10, 38:15, 38:20, 41:14, 41:16, 42:17, 43:11, 46:7, 46:14, 48:16, 49:11, 49:14, 49:17, 49:19, 49:22, 50:8, 50:10, 50:24, 51:1, 51:6, 52:22, 52:25, 53:5, 54:8, 54:16, 54:18, 54:21, 54:23, 55:1, 55:10, 55:16, 56:11, 56:13, 56:15, 56:20
**MS** [28] - 3:6, 25:9, 27:13, 28:18, 31:6, 31:8, 31:14, 31:25, 33:17, 33:24, 34:20, 35:5, 36:4, 36:25, 45:23, 46:12, 50:5, 50:17, 50:22, 51:10, 51:16, 52:20, 53:9, 53:19, 54:3, 54:14, 55:6, 56:9
**must** [3] - 25:19, 28:16, 53:23
**mutually** [4] - 11:17, 25:15, 29:2, 45:9

## N

**nail** [2] - 25:10, 37:11
**naval** [3] - 21:11, 21:12, 21:22
**Navy** [18] - 13:16, 13:17, 16:22, 17:7, 17:9, 17:16, 17:21, 20:24, 21:17, 23:17, 24:1, 24:6, 24:16, 26:21, 27:2, 27:8, 30:4, 39:17
**necessarily** [3] - 6:15, 9:18, 34:6
**need** [7] - 4:5, 6:15, 22:3, 23:5, 53:17, 54:2, 55:24
**needle** [1] - 28:14
**needs** [2] - 23:5, 30:18
**Never** [1] - 17:7
**never** [3] - 23:19, 26:21, 35:20
**new** [1] - 52:8
**New** [4] - 1:19, 1:24, 2:8
**Next** [2] - 24:7, 27:1
**next** [3] - 32:10, 56:2, 56:18
**nobody** [2] - 6:10, 38:2
**nobody's** [1] - 38:1
**none** [1] - 36:21
**normally** [2] - 8:25, 10:2
**Northwest** [5] - 1:16, 1:19, 2:3, 2:11, 57:14
**note** [2] - 26:14, 56:3
**noted** [1] - 10:16
**notes** [1] - 57:5
**nothing** [3] - 20:16, 54:3, 56:9
**notices** [2] - 52:14, 52:15
**November** [9] - 32:25, 45:20, 49:2, 52:13, 52:15, 53:25, 54:12, 55:3
**number** [2] - 14:13, 52:8
**numbers** [1] - 39:23

## O

**O'NEILL** [1] - 1:22
**O'Neill** [2] - 3:12, 3:14
**object** [3] - 15:3, 49:6, 55:13
**objection** [9] - 49:9, 51:9, 51:10, 51:11, 54:14, 55:9, 55:10, 55:11, 55:16
**obtain** [1] - 27:1
**obvious** [3] - 7:6, 10:4, 35:3
**obviously** [11] - 7:5, 9:6, 13:23, 14:5, 18:13, 22:22, 37:22, 39:24, 42:1, 49:9, 52:17
**occasion** [1] - 27:21
**occasions** [2] - 27:20, 32:19
**occurred** [1] - 37:2
**OF** [6] - 1:1, 1:3, 1:11, 1:16, 1:18, 2:6
**offense** [1] - 45:4
**offenses** [2] - 33:20, 43:19
**offer** [5] - 9:17, 14:20, 15:3, 35:10, 41:24
**offered** [1] - 24:13
**offering** [2] - 8:3, 35:13
**offers** [1] - 54:1
**OFFICE** [1] - 1:15
**OFFICES** [1] - 2:6
**official** [5] - 21:12, 21:22, 33:12, 57:12
**Official** [1] - 2:10
**one** [21] - 7:6, 7:15, 15:19, 16:17, 18:25, 19:4, 22:11, 27:14, 28:9, 28:10, 28:12, 31:4, 38:18, 38:22, 42:11, 42:17, 43:11, 46:12, 51:2, 53:11
**ones** [1] - 38:6
**ongoing** [1] - 17:9
**open** [4] - 9:4, 24:18,

46:8, 48:5
**opening** [1] - 14:14
**openly** [2] - 21:18, 22:15
**opportunity** [3] - 3:24, 9:24, 10:6
**opposed** [2] - 8:3, 16:17
**opposition** [1] - 43:18
**oppositional** [4] - 6:12, 7:4, 8:19, 40:21
**oppositions** [1] - 52:12
**option** [1] - 9:4
**order** [4] - 13:1, 33:22, 37:13, 43:22
**orders** [1] - 37:23
**ordinarily** [1] - 5:16
**otherwise** [1] - 53:7
**outcome** [1] - 18:18
**outlined** [1] - 25:17
**outset** [1] - 31:24
**overcome** [1] - 15:13
**overly** [1] - 4:7
**overruling** [1] - 49:9
**overshare** [2] - 40:5, 40:6
**oversharer** [1] - 30:15
**own** [5] - 13:6, 13:9, 14:22, 15:8, 35:13

## P

**p.m** [2] - 54:12, 55:3
**package** [1] - 34:8
**pages** [1] - 54:9
**paint** [1] - 27:14
**papers** [3] - 6:21, 12:6, 19:4
**PARLATORE** [22] - 1:21, 1:22, 3:10, 4:25, 5:25, 6:19, 7:21, 8:24, 9:3, 9:8, 9:13, 10:15, 11:8, 37:10, 38:15, 38:20, 46:7, 52:22, 52:25, 53:5, 54:8, 56:11
**Parlatore** [20] - 3:11, 4:13, 4:23, 7:14, 17:24, 18:13, 25:12, 25:25, 26:7, 27:24, 37:8, 45:6, 46:6, 48:10, 48:19, 48:21, 52:21, 54:6, 55:22, 56:10
**Parlatore's** [3] - 18:2, 25:11, 45:1
**part** [3] - 20:8, 26:18, 27:2
**parte** [2] - 46:15, 48:7
**participated** [1] - 32:11
**participating** [1] - 33:12
**particular** [2] - 31:21, 44:11
**particularly** [3] - 27:7, 29:9, 33:1
**parties** [4] - 51:23, 52:1, 52:3, 52:10
**pass** [1] - 28:1
**Passover** [1] - 51:3
**path** [1] - 11:18
**pending** [1] - 16:2
**people** [15] - 13:5, 14:21, 16:2, 16:20, 16:21, 17:10, 17:18, 19:19, 20:16, 21:17, 23:5, 29:8, 29:25, 30:21
**per** [1] - 34:20
**period** [1] - 23:24
**perjury** [1] - 8:7
**permissible** [1] - 44:17
**perpetual** [1] - 23:14
**PERRY** [4] - 2:2, 50:24, 51:1, 51:6
**Perry** [2] - 3:16, 51:1
**persisted** [1] - 24:9
**person** [3] - 8:17, 20:15, 38:18
**Person** [28] - 15:21, 15:22, 16:12, 17:4, 17:19, 21:5, 21:6, 21:9, 21:18, 22:6, 22:9, 22:11, 22:12, 33:8, 34:5, 34:7, 34:10, 34:12, 34:18, 34:22, 39:24, 42:3, 42:9, 42:19, 42:22
**personal** [4] - 14:2, 17:20, 21:20, 35:2
**personally** [1] - 30:6
**personnel** [4] - 29:23, 30:9, 30:16, 30:22
**perspective** [8] - 12:13, 12:20, 12:24, 18:7, 18:17, 21:24, 24:14, 45:22
**persuaded** [1] - 44:3
**Phase** [3] - 30:1, 30:3, 30:6
**phased** [1] - 29:21
**pick** [1] - 14:21
**pieces** [1] - 29:20
**pitch** [1] - 29:13
**place** [1] - 36:5
**places** [1] - 36:2
**Plains** [1] - 2:8
**Plaintiff** [1] - 1:4
**plan** [1] - 29:21
**planned** [1] - 33:8
**plea** [1] - 54:1
**plentiful** [2] - 12:9, 13:8
**point** [17] - 5:17, 10:1, 18:24, 22:11, 23:22, 25:12, 27:24, 28:19, 30:14, 34:8, 38:25, 39:14, 42:18, 42:19, 44:3, 45:1, 45:22
**pointing** [12] - 5:13, 5:23, 6:8, 6:24, 10:10, 18:8, 24:21, 28:16, 38:18, 38:22, 45:7, 45:11
**portray** [1] - 33:9
**portrayed** [2] - 44:16, 44:17
**portraying** [1] - 44:15
**position** [8] - 6:12, 16:4, 25:24, 28:15, 33:10, 35:23, 36:5, 42:21
**possibility** [2] - 6:22, 31:24
**possible** [2] - 41:20, 51:2
**possibly** [2] - 11:6, 42:15
**post** [1] - 44:7
**post-arrest** [1] - 44:7
**posture** [1] - 9:6
**potential** [1] - 44:24
**potentially** [2] - 45:20, 53:2
**pox** [1] - 18:21
**practical** [1] - 41:18
**practically** [1] - 31:2
**prefer** [2] - 48:20, 48:22
**prejudice** [13] - 19:1, 31:20, 32:3, 32:4, 32:12, 33:21, 33:25, 37:14, 38:9, 42:21, 43:21
**prejudicial** [5] - 4:7, 19:11, 22:1, 33:16, 33:18
**preliminary** [3] - 39:12, 51:21, 51:25
**premature** [1] - 27:25
**prep** [1] - 46:1
**prepare** [1] - 55:25
**presence** [1] - 56:18
**present** [7] - 12:4, 21:3, 22:10, 25:4, 29:8, 41:24, 42:24
**presented** [2] - 10:18, 13:11
**presenting** [1] - 40:15
**preserved** [1] - 9:23
**preserving** [1] - 55:11
**press** [1] - 12:2
**presumably** [1] - 22:8
**pretrial** [9] - 9:24, 37:13, 37:23, 50:2, 50:11, 50:20, 51:2, 51:12, 51:14
**pretty** [2] - 9:11, 52:7
**prevent** [1] - 36:7
**primarily** [2] - 3:22, 6:17
**privately** [3] - 35:7, 46:13, 49:19
**privy** [1] - 48:18
**pro** [9] - 4:15, 4:17, 6:11, 7:12, 12:5, 40:16, 40:18, 41:7, 41:12
**problem** [3] - 5:18, 16:18, 24:5
**problematic** [2] - 27:11, 28:17
**Proceedings** [1] - 56:22
**proceedings** [3] - 43:14, 48:4, 57:6
**processes** [1] - 30:19
**produced** [1] - 57:6
**Production** [2] - 53:9, 53:12
**production** [3] - 53:11, 54:9, 55:21
**profile** [1] - 33:11
**progress** [1] - 23:24
**promote** [1] - 30:3
**prophylactically** [1] - 10:7
**proposed** [3] - 51:20, 51:21, 52:2
**propositions** [1] - 37:17
**prosecutor** [1] - 27:11
**prosecutors** [1] - 41:9
**prospect** [1] - 21:18
**prototypical** [1] - 28:8
**prove** [1] - 27:20
**provide** [1] - 43:23
**proving** [2] - 26:9, 26:11
**prudent** [1] - 45:14
**pull** [1] - 38:21
**purported** [1] - 14:9
**purpose** [4] - 26:9, 26:11, 27:18, 32:17
**push** [1] - 56:4
**pushed** [1] - 39:12
**pushing** [1] - 28:14
**put** [16] - 6:17, 10:20, 13:2, 14:11, 25:9, 25:22, 25:23, 29:5, 29:15, 29:17, 29:25, 30:8, 35:15, 35:17, 49:6, 54:3
**puts** [2] - 4:20, 30:15
**putting** [3] - 14:10, 16:7, 54:2

## Q

**questions** [7] - 51:22, 51:25, 52:5, 52:8, 52:17, 52:19, 52:20
**quick** [2] - 52:8, 52:22
**quickly** [2] - 41:14, 41:15
**quid** [9] - 4:15, 4:17, 6:11, 7:12, 12:5, 40:16, 40:18, 41:7, 41:12
**QUINN** [2] - 1:22, 2:3
**QUINN-O'NEILL** [1] - 1:22
**quite** [1] - 11:9
**quo** [8] - 4:15, 4:17, 6:11, 7:12, 12:5, 40:18, 41:7, 41:12
**quoted** [2] - 14:17, 14:18
**quoting** [1] - 29:18

## R

**raise** [4] - 20:18, 43:25, 44:5, 44:6
**raised** [5] - 5:5, 5:6, 18:22, 41:17, 56:6
**ran** [2] - 20:24
**rather** [3] - 9:23,

32:9, 45:15
**RDR** [3] - 2:9, 57:3, 57:12
**re** [1] - 33:3
**re-up** [1] - 33:3
**read** [1] - 37:12
**readily** [1] - 19:6
**reading** [1] - 6:21
**ready** [3] - 39:13, 48:21, 48:23
**real** [3] - 12:4, 12:11, 41:14
**realistic** [1] - 45:21
**realize** [2] - 12:14, 31:20
**really** [8] - 4:5, 5:11, 6:12, 11:18, 12:19, 38:8, 40:25, 44:20
**reams** [1] - 42:3
**reason** [9] - 9:9, 11:6, 11:22, 12:1, 18:1, 18:6, 19:21, 24:23, 37:1
**reasonably** [1] - 20:12
**received** [1] - 4:18
**recess** [1] - 43:13
**recharge** [1] - 39:7
**recognition** [1] - 56:5
**recognize** [1] - 55:22
**reconfirm** [1] - 33:3
**reconsider** [1] - 48:24
**record** [6] - 3:5, 10:3, 54:2, 54:4, 55:4, 55:12
**recruit** [1] - 34:5
**reengage** [1] - 33:3
**referenced** [1] - 55:22
**reflecting** [1] - 33:1
**reflects** [1] - 29:12
**related** [1] - 6:2
**relationship** [3] - 17:20, 21:21, 42:12
**relevant** [1] - 18:10
**relied** [1] - 29:8
**relief** [1] - 43:24
**relying** [1] - 28:21
**remain** [1] - 56:7
**remedy** [5] - 9:11, 9:24, 10:6, 32:3, 36:18
**remember** [1] - 51:14
**repeatedly** [3] - 20:20, 30:20, 32:22
**replies** [2] - 43:18, 51:18
**REPORTED** [1] - 2:9
**reported** [1] - 38:10
**Reporter** [2] - 2:10, 57:12
**representations** [1] - 48:8
**request** [2] - 48:24, 49:1
**requested** [1] - 49:10
**require** [1] - 53:20
**required** [4] - 28:7, 28:12, 32:5, 56:4
**requires** [1] - 43:24
**resemblance** [1] - 13:7
**respect** [1] - 16:24
**responded** [1] - 25:25
**responses** [2] - 52:2, 54:6
**rest** [1] - 46:2
**result** [1] - 40:21
**retire** [1] - 23:18
**retired** [1] - 17:9
**retirement** [3] - 27:5, 30:7, 30:12
**review** [1] - 55:24
**rewriting** [1] - 52:7
**risk** [4] - 4:3, 32:4, 32:9, 32:12
**ROBERT** [1] - 1:6
**Robert** [1] - 3:3
**Rocco** [1] - 3:18
**ROCCO** [2] - 2:6, 2:6
**room** [2] - 28:9, 38:13
**Room** [1] - 2:12
**Rothstein** [1] - 3:8
**ROTHSTEIN** [3] - 1:15, 43:11, 46:14
**Rule** [3] - 33:20, 37:12, 43:19
**rule** [1] - 37:22
**rules** [2] - 16:22, 43:2

## S

**salary** [1] - 40:1
**sales** [1] - 29:13
**salon** [1] - 34:24
**saw** [1] - 38:20
**schedule** [6] - 50:15, 50:18, 50:20, 52:19, 53:24, 55:19
**scheme** [2] - 20:8, 29:20
**se** [1] - 34:20
**seal** [1] - 48:6
**seats** [1] - 8:5
**second** [2] - 27:11, 29:13
**section** [2] - 26:17, 26:18
**secure** [1] - 30:5
**see** [9] - 3:23, 9:13, 11:5, 11:12, 11:18, 14:5, 17:23, 44:22, 45:15
**seek** [1] - 42:1
**seeking** [5] - 25:22, 25:23, 26:8, 45:5, 45:18
**sell** [1] - 34:22
**semblance** [1] - 13:7
**send** [1] - 52:5
**sends** [2] - 23:25, 24:2
**senior** [2] - 21:11, 21:17
**sense** [2] - 31:23, 53:18
**sent** [2] - 53:9, 53:12
**separate** [4] - 31:3, 33:22, 38:1, 43:22
**September** [3] - 1:6, 53:12, 57:10
**serious** [1] - 39:13
**services** [1] - 34:24
**set** [12] - 45:23, 45:24, 46:4, 48:10, 49:24, 50:2, 50:13, 50:17, 50:19, 51:2, 55:2
**sets** [1] - 36:11
**setting** [3] - 32:9, 34:2, 50:11
**sever** [9] - 3:23, 4:4, 11:23, 37:25, 43:16, 43:17, 43:23, 44:12, 45:15
**several** [1] - 43:25
**severance** [27] - 4:1, 8:4, 11:7, 18:1, 18:4, 25:19, 26:3, 28:2, 28:3, 28:4, 28:5, 31:10, 32:2, 33:18, 33:25, 34:1, 36:5, 36:18, 36:20, 36:22, 37:13, 37:23, 44:1, 44:9, 49:10, 55:12, 56:3
**severe** [2] - 19:1, 38:10
**severed** [1] - 36:15
**severing** [1] - 11:6
**shared** [1] - 34:11
**shot** [3] - 28:10, 28:11, 38:18
**show** [18] - 12:25, 13:3, 14:20, 15:4, 15:15, 15:18, 17:1, 23:13, 23:14, 23:23, 24:3, 25:1, 25:2, 30:13, 34:4, 34:7, 34:12, 34:21
**showing** [4] - 7:12, 16:8, 16:15, 17:15
**shows** [9] - 29:14, 32:10, 32:20, 32:21, 35:12, 39:11, 39:15, 39:16, 40:4
**side** [4] - 9:21, 19:4, 33:14, 38:11
**sidebar** [1] - 46:15
**sides** [3] - 37:17, 45:10, 45:14
**significant** [4] - 6:5, 18:23, 39:24, 55:23
**similar** [3] - 9:17, 38:7, 38:8
**similarities** [1] - 8:8
**simply** [2] - 5:3, 33:17
**sitting** [1] - 8:5
**situation** [12] - 4:21, 5:8, 5:12, 5:15, 6:18, 6:23, 7:23, 8:10, 12:7, 36:3, 38:17, 40:14
**skepticism** [1] - 37:5
**slimy** [1] - 29:16
**small** [1] - 32:13
**someone** [1] - 44:16
**sorry** [5] - 15:7, 23:22, 34:16, 43:11, 49:15
**sounds** [2] - 54:8, 55:20
**spades** [1] - 29:1
**specific** [7] - 6:16, 25:19, 25:21, 27:21, 32:6, 32:19
**speculating** [1] - 9:10
**speedy** [6] - 49:1, 53:23, 55:5, 55:7, 55:17, 56:1
**spend** [1] - 19:24
**squad** [1] - 8:19
**squarely** [1] - 40:20
**stage** [1] - 37:21
**stand** [3] - 7:7, 43:7, 53:7
**standard** [6] - 8:4, 10:1, 34:2, 37:18, 40:20, 52:5
**star** [2] - 15:19, 20:24
**stark** [1] - 19:14
**start** [2] - 11:16, 55:18
**started** [1] - 18:4
**starting** [3] - 3:5, 25:10, 46:8
**state** [3] - 15:12, 41:4, 52:23
**statements** [9] - 4:3, 12:2, 14:15, 14:23, 14:24, 22:4, 36:11, 42:9, 44:7
**States** [7] - 2:10, 3:2, 3:7, 26:5, 28:20, 28:22, 57:13
**STATES** [4] - 1:1, 1:3, 1:12, 1:15
**status** [6] - 53:17, 53:20, 54:10, 55:3, 56:2, 56:18
**STATUS** [1] - 1:11
**stenographic** [1] - 57:5
**still** [5] - 16:1, 18:17, 20:7, 23:7, 23:11
**story** [1] - 21:10
**strange** [1] - 42:21
**strategic** [1] - 25:17
**strategy** [1] - 9:21
**Street** [2] - 1:16, 2:3
**strict** [3] - 20:9, 20:10
**stride** [1] - 7:19
**strong** [2] - 39:9, 44:25
**stuff** [1] - 24:23
**stupid** [3] - 19:17, 19:21, 24:22
**subject** [1] - 53:14
**subjected** [2] - 36:12, 36:14
**substantially** [1] - 53:13
**substantive** [1] - 23:7
**succeeded** [2] - 26:22, 33:5
**suffer** [2] - 4:3, 19:1
**sufficient** [1] - 36:17
**suggest** [1] - 17:10
**suggesting** [2] - 4:17, 45:1
**suggestion** [1] - 4:11
**Suite** [3] - 1:19, 2:4, 2:7
**SULLIVAN** [1] - 2:3
**support** [2] - 36:22, 51:19
**suppose** [1] - 6:17
**supposed** [2] - 43:4, 43:5
**suppress** [1] - 53:4

**suppressed** [1] - 4:4
**suppression** [2] - 11:11, 53:1
**surprised** [2] - 22:14, 42:23
**suspect** [1] - 9:16
**switching** [1] - 48:8
**sworn** [2] - 42:22, 43:6

## T

**table** [2] - 3:8, 8:6
**tactical** [2] - 25:17, 28:3
**talks** [2] - 10:23, 12:10
**ten** [3] - 31:12, 31:13, 31:14
**tension** [1] - 18:7
**term** [1] - 13:4
**terms** [2] - 13:22, 41:17
**terribly** [2] - 7:17, 20:2
**testifies** [4] - 14:25, 18:16, 22:23, 42:11
**testify** [15] - 5:20, 6:7, 6:22, 6:24, 8:22, 13:23, 13:25, 14:4, 14:5, 22:4, 22:9, 22:23, 26:1, 26:2
**testifying** [5] - 7:15, 7:18, 10:9, 36:8, 36:17
**testimony** [6] - 26:4, 28:4, 36:6, 36:13, 42:22, 43:6
**text** [5] - 16:11, 34:15, 35:15, 37:12, 37:22
**Thanksgiving** [3] - 54:19, 54:20, 54:25
**that'll** [3] - 25:1, 48:6, 49:4
**THE** [96] - 1:1, 1:11, 1:15, 1:16, 1:21, 2:2, 2:6, 3:1, 3:9, 3:13, 3:17, 3:20, 5:22, 6:14, 7:14, 8:21, 9:2, 9:5, 9:9, 10:8, 11:5, 11:13, 14:8, 15:7, 15:10, 15:15, 15:21, 17:23, 18:5, 20:1, 25:3, 25:6, 25:8, 27:6, 28:15, 31:1, 31:7, 31:13, 31:15, 33:6, 33:19, 34:16, 35:4, 35:23, 36:23, 37:7, 38:12, 38:16, 41:13, 41:15, 42:16, 43:8, 43:12, 43:15, 46:3, 46:8, 46:16, 48:6, 49:8, 49:12, 49:15, 49:18, 49:21, 49:24, 50:6, 50:9, 50:11, 50:19, 50:23, 50:25, 51:5, 51:7, 51:11, 51:17, 52:21, 52:24, 53:3, 53:6, 53:16, 54:1, 54:5, 54:10, 54:15, 54:17, 54:20, 54:22, 54:24, 55:2, 55:9, 55:14, 55:17, 56:10, 56:12, 56:14, 56:16, 56:21
**theme** [2] - 7:8, 9:18
**themselves** [2] - 15:3, 20:14
**theoretically** [1] - 44:21
**theories** [3] - 44:1, 44:12, 45:10
**theory** [4] - 6:14, 23:2, 34:18, 36:1
**thereafter** [1] - 24:2
**therefore** [1] - 32:18
**Thereupon** [1] - 43:13
**they've** [4] - 21:19, 23:2, 41:7, 56:6
**thinking** [3] - 14:20, 33:10, 53:16
**threat** [1] - 36:16
**three** [5] - 8:13, 8:18, 29:21, 41:21, 41:25
**three-phased** [1] - 29:21
**three-way** [2] - 8:13, 8:18
**TIMOTHY** [1] - 1:21
**Timothy** [1] - 3:10
**today** [2] - 18:25, 39:25
**together** [1] - 35:17
**tolling** [2] - 55:17, 56:1
**Toni** [1] - 3:11
**top** [3] - 8:12, 19:15, 27:17
**touch** [1] - 26:24
**train** [1] - 18:4
**TRANSCRIPT** [1] - 1:11
**transcript** [2] - 57:5, 57:6
**travel** [1] - 46:1
**TREVOR** [1] - 1:11
**trial** [41] - 4:2, 5:7, 8:6, 9:7, 9:20, 9:25, 10:12, 10:20, 18:10, 18:11, 18:18, 23:24, 25:19, 31:6, 31:19, 32:6, 32:7, 36:14, 37:19, 40:13, 41:18, 42:14, 43:21, 45:5, 45:15, 45:19, 45:24, 46:1, 46:4, 46:9, 49:1, 49:4, 49:6, 49:25, 53:23, 55:5, 55:7, 55:17, 56:1, 56:4
**trials** [6] - 31:10, 33:22, 38:1, 41:19, 43:22, 43:23
**tricked** [1] - 36:1
**tried** [3] - 10:13, 34:5, 35:17
**tries** [1] - 23:20
**true** [3] - 42:15, 57:4, 57:5
**trusted** [1] - 30:22
**truth** [3] - 13:5, 13:7, 17:2
**truthful** [2] - 17:15, 19:14
**try** [8] - 7:10, 14:21, 18:14, 24:25, 31:21, 31:23, 52:7
**trying** [5] - 34:9, 34:21, 35:1, 37:19, 45:8
**Tuesday** [1] - 46:9
**tweaks** [1] - 52:6
**two** [20] - 5:12, 5:16, 6:9, 8:5, 16:16, 21:13, 23:5, 28:8, 29:9, 30:23, 31:3, 38:12, 40:4, 41:17, 41:19, 41:21, 53:10, 54:11
**type** [6] - 7:3, 7:7, 7:12, 7:25, 10:19, 22:21

## U

**U.S** [1] - 1:18
**ultimately** [1] - 37:18
**under** [5] - 24:12, 36:21, 36:22, 43:19, 48:6
**undermining** [1] - 6:5
**understood** [8] - 12:2, 12:7, 23:16, 27:13, 34:6, 34:10, 34:16, 55:14
**unfair** [1] - 37:6
**unique** [1] - 9:14
**unit** [1] - 20:24
**UNITED** [4] - 1:1, 1:3, 1:12, 1:15
**united** [1] - 2:10
**United** [6] - 3:2, 3:7, 26:5, 28:20, 28:22, 57:13
**universe** [1] - 35:16
**unless** [3] - 9:20, 14:24, 23:1
**unsuccessfully** [1] - 45:9
**untenable** [5] - 4:21, 6:18, 25:24, 36:2, 36:5
**untruthfulness** [1] - 13:15
**unusual** [1] - 7:17
**up** [13] - 8:13, 9:15, 9:16, 10:23, 11:22, 16:7, 21:10, 27:24, 33:3, 37:24, 40:14, 41:11, 41:24
**URQUHART** [1] - 2:3
**usual** [1] - 52:10

## V

**various** [1] - 4:18
**version** [1] - 5:18
**versus** [5] - 3:2, 5:5, 26:5, 28:20, 28:22
**vet** [1] - 21:23
**viable** [1] - 11:18
**victim** [2] - 28:10, 28:11
**voir** [4] - 51:21, 51:25, 52:5, 52:7
**vs** [1] - 1:5

## W

**wait** [1] - 49:4
**waiting** [1] - 45:15
**waive** [1] - 56:18
**wants** [5] - 4:2, 5:19, 10:24, 21:22, 29:17
**warranted** [1] - 44:1
**Washington** [6] - 1:6, 1:17, 1:20, 2:4, 2:12, 57:14
**wealth** [1] - 17:1
**week** [3] - 45:25, 51:2, 54:20
**weeks** [2] - 53:10
**WhatsApp** [4] - 16:11, 17:3, 21:8, 22:6
**WhatsApps** [1] - 42:3
**whatsoever** [1] - 35:11
**whereas** [1] - 29:13
**White** [1] - 2:8
**whole** [3] - 10:17, 18:4, 20:25
**wholesale** [1] - 52:7
**wide** [1] - 46:8
**wider** [1] - 30:4
**WILLIAM** [1] - 2:2
**William** [1] - 3:15
**willing** [1] - 5:17
**win** [2] - 23:9, 23:10
**witness** [3] - 7:22, 8:9, 39:7
**witnesses** [9] - 7:9, 11:3, 15:18, 15:20, 16:8, 18:15, 25:1, 39:21
**word** [1] - 37:9
**words** [1] - 35:13
**works** [1] - 49:20
**writing** [2] - 29:6, 29:18
**wrote** [2] - 29:22, 30:1

## Y

**year** [3] - 40:1, 46:2, 49:5
**yoga** [1] - 34:24
**YONGCHUL** [1] - 1:6
**Yongchul** [1] - 3:3
**York** [4] - 1:19, 1:24, 2:8
**yourselves** [1] - 3:5

## Z

**zero** [1] - 32:10